See also D.C., 393 F.Supp. 428, D.C., 379 F.Supp. 1218.

Brenda EVANS et al., Plaintiffs,

Board of Public Education of the City of Wilmington, Intervening Plaintiff,

v.

Madeline BUCHANAN et al., constituting all the members of the State Board of Education of the State of Delaware, Defendants,

Alexis I. duPont et al., Intervening Defendants.

Nos. 76–2103 to 76–2107.

United States Court of Appeals, Third Circuit.

Argued March 30, 1977.

Decided May 18, 1977.

374

John P. Sinclair, Potter, Anderson & Corroon, Wilmington, Del., for the Newark School Dist., appellant.

James T. McKinstry, Richards, Layton & Finger, Wilmington, Del., for the Claymont School Dist. and the Stanton School Dist., appellant.

David F. Anderson, Potter, Anderson & Corroon, Wilmington, Del., for New Castle-Gunning Bedford School Dist., appellant.

Edward W. Cooch, Jr., Cooch & Taylor, Wilmington, Del., for Marshallton-McKean School Dist., appellant; Lino A. Graglia, Austin, Tex., of counsel.

James M. Tunnell, Jr., Richard D. Allen, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., amicus curiae, Mount Pleasant School Dist.

William Poole, Potter, Anderson & Corroon, Wilmington, Del., amicus curiae, Alfred I. duPont School Dist.

Jerome O. Herlihy, Herlihy & Herlihy, Wilmington, Del., amicus curiae, Conrad Area School Dist.

Samuel R. Russell, Biggs & Battaglia, Wilmington, Del., amicus curiae, Alexis I. duPont School Dist.

Louis R. Lucas, Ratner, Sugarmon, Lucas, Salky & Henderson, Memphis, Tenn., William L. Taylor, Center for National Policy Review, Washington, D. C., Paul R. Dimond, O'Brien, Moran & Dimond, Ann Arbor, Mich., Richard Allen Paul, Wilmington, Del., for appellees-intervening plaintiffs.

Louis L. Redding, Joseph Rosenthal, Irving Morris, Morris & Rosenthal, Wilmington, Del., for appellees-plaintiffs.

Drew S. Days, III, Asst. Atty. Gen., Brian K. Landsberg, Vincent F. O'Rourke, Jr., Dept. of Justice, Washington, D. C., amicus curiae, United States of America.

Richard R. Wier, Jr., Atty. Gen. of the State of Delaware, Regina M. Small, Deputy Atty. Gen. of the State of Delaware, Wilmington, Del., William Prickett, Mason E. Turner, Jr., Prickett, Ward, Burt & Sanders, Wilmington, Del., for the Delaware State Bd. of Ed., appellants; Philip B. Kurland, Chicago, Ill., of counsel.

Before VAN DUSEN, ALDISERT, ADAMS, ROSENN, HUNTER, WEIS and GARTH, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

The major question presented in this review of a three-judge court's judgment ordering the Delaware Board of Education to desegregate its school system is the propriety of the court's inter-district remedy. As hereinafter modified, the district court's judgment will be affirmed.

The present appeal is, we trust, the final chapter in an extensive series of proceedings initiated twenty years ago "to eliminate the *de jure* segregation in Delaware schools," *Evans v. Buchanan*, 393 F.Supp. 428, 430 (D.Del.1975), and to effectuate "a transition to a racially nondiscriminatory school system" as required by *Brown v. Board of Education (Brown II)*, 349 U.S. 294, 301, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955).[1] A three-judge court was convened in 1971 in response to the plaintiffs' concern that Delaware's Educational Advancement Act of 1968, which gave the State Board of Education the power to reorganize existing school districts, 14 Del.C. § 1001, but excluded the Wilmington school district from reorganization, *see id.* §§ 1004(c)(2) and (4), 1005, 1021, 1026(a), offended the principles of *Brown*.

In its initial opinion, *Evans v. Buchanan*, 379 F.Supp. 1218 (D.Del.1974), the court concluded that "segregated schooling in Wilmington has never been eliminated and that there still exists a dual school system," *id.* at 1223, and, accordingly, ordered the State Board of Education to submit plans to remedy existing segregation. *Id.* at 1224. The court postponed the date set for submission of the plans, however, after the Supreme Court issued its opinion in *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). In its 1975 deliberations, having invited all affected school districts to present evidence on all issues before the court, and applying *Milliken* standards to the record evidence thus adduced, the court found significant inter-district, *de jure* segregation in New Castle County. *Evans v. Buchanan*, 393 F.Supp. 428, 431–32, 438, 445, 447 (D.Del.1975). At this time, the court held unconstitutional those provisions of Delaware's Educational Advancement Act which excluded Wilmington from eligibility for reorganization, and again ordered submission of both Wilmington-only and inter-district plans to remedy the inter-district segregation. *Id.* at 447. The State Board of Education and the intervening suburban school districts (except DeLaWarr) appealed this judgment to the Supreme Court pursuant to 28 U.S.C. § 1253. On November 17, 1975, the Supreme Court summarily affirmed the district court. *Buchanan v. Evans*, 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975).

On May 19, 1976, after three weeks of evidentiary hearings on the plans submitted by the parties, the district court reiterated its finding of an inter-district violation: "We establish here only that the remedy which we order may include the suburban districts, because their existence and their actions were part of the violations which lead to the remedy." *Evans v. Buchanan*, 416 F.Supp. 328, 341 n. 43 (D.Del.1976). In considering the various plans submitted, the court found Wilmington-only plans unacceptable, *id.* at 343–44, and rejected the

1. For a comprehensive history of this litigation, *see Evans v. Buchanan*, 379 F.Supp. 1218, 1220–21 (D.Del.1974).

specific inter-district remedies proposed by the parties. The latter included plans relying on voluntary transfer inducement ("magnet" plans), *id.* at 345–46, and several proposals utilizing cluster and pairing techniques, *id.* at 346–48, which the court determined to be "fraught with complex problems unsuitable for judicial determination" and which would "place the Court in the ongoing position of general supervisor of education in New Castle County." *Id.* at 347.

On June 15, 1976, the district court ordered that Delaware schools in the area north of the northern line of the Appoquinimink School District—the area presently comprised of the Alfred I. duPont, Alexis I. duPont, Claymont, Conrad, DeLaWarr, Marshallton-McKean, Mount Pleasant, Newark, New Castle-Gunning Bedford, Stanton, and Wilmington School Districts—be desegregated and reorganized into a new or such other new districts as would comply with the court's May 19, 1976 opinion. The May 19 opinion had set the date for full compliance with constitutional requirements on all grade levels as September 1978. 416 F.Supp. at 361.

Thereafter, appellants took an appeal to the Supreme Court which, on November 29, 1976, dismissed the appeal on jurisdictional grounds. 423 U.S. 1080, 96 S.Ct. 868, 47 L.Ed.2d 91 (1976). The present protective appeals to this court were then pursued.

### I.

■ The Supreme Court's summary affirmance of the district court's 1975 order would appear to be binding on this court under the law of the case principle, which has been explained by the Supreme Court as follows:

> When matters are decided by an appellate court, its rulings, unless reversed by it or a superior court, bind the lower court. Thus a cause proceeds to final determination. While power rests in a federal court that passes an order or decision to change its position on a subsequent review in the same cause, orderly judicial action, except in unusual circumstances, requires it to refuse to permit the relitigation of matters or issues previously determined on a former review.

*Insurance Group Committee v. Denver & Rio Grande Western R. R.*, 329 U.S. 607, 612, 67 S.Ct. 583, 585, 91 L.Ed. 547 (1947) (footnote omitted).

■ Under the rule of *Hicks v. Miranda*, 422 U.S. 332, 344–45, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975), lower courts, being bound by summary decisions of the United States Supreme Court, may not reexamine constitutional questions necessarily decided in a summary affirmance. In cases of summary adjudication, of course, it is not always crystal clear what exactly was adjudicated by the Supreme Court, *see Super Tire Engineering Co. v. McCorkle*, 550 F.2d 903, 906 (3d Cir. 1977), but in this case we conclude that the Supreme Court affirmed the finding of one or more inter-district constitutional violations. The district court found a constitutional violation and ordered the parties to submit both Wilmington-only and inter-district plans. Thus, in exercising its review function, the Supreme Court perforce considered both the constitutional violation and its inter-district character. Had the Court disapproved of these lower court findings, it would either have found no constitutional violation, thereby precluding the submission of *any* plan, or, alternatively, it would have prohibited the filing of an inter-district plan.

The dissent urges that we should determine which of the eight violations found by the district court were affirmed or not affirmed by the Supreme Court. In view of the doctrine of the law of the case and the very brief order by the Supreme Court, this would become a highly speculative exercise, if indeed, this court has the power to attempt a modification of the Supreme Court's judgment. If the defendants believe that some of the eight alleged violations were not affirmed, they should take, or perhaps previously should have taken, appropriate steps to obtain review of this matter, or a clarification, by the Supreme Court. To order a remand and further proceedings by the district court might well

impose an unsolvable problem upon the district court.[2]

■ The law of the case principle also precludes this court from entertaining appellants' suggestion that the Supreme Court's decision of November 17, 1975, was somehow altered by its June 7, 1976, decision in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The short answer is that it remains for the Supreme Court, not an "inferior" tribunal, to entertain this contention. *Insurance Group Committee v. Denver & Rio Grande Western R. R., supra.* Nor are we persuaded that the *Davis* decision constitutes an "unusual circumstances" exception to the law of the case, in view of the Supreme Court's own explanation that "the holding in *Davis* reaffirmed a principle well established in a variety of contexts. *E. g., Keyes v. School District No. 1*, 413 U.S. 189, 208, 93 S.Ct. 2686, 2697, 37 L.Ed.2d 548 (1973) (schools); *Wright v. Rockefeller*, 376 U.S. 52, 56–57, 84 S.Ct. 603, 605, 11 L.Ed.2d 512 (1964) (election districting); *Akins v. Texas*, 325 U.S. 398, 403–404, 65 S.Ct. 1276, 1279, 89 L.Ed. 1692 (1945) (jury selection)." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). We hold, therefore, that one or more interdistrict constitutional violations were found by the district court and affirmed by the Supreme Court. Those rulings now constitute the law of the case. Accordingly, we are precluded from re-examining them. Instead, our concentration must be upon the court-ordered remedy.

## II.

### A.

■ Before considering the specifics of the remedy ordered by the district court, it is important to emphasize that, as a reviewing court, we are not empowered to consider the matter *de novo*. The fashioning of a remedy is committed to "the exercise of the district judge's discretion . . . [and] a school desegregation case does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right." *Swann v. Board of Education*, 402 U.S. 1, 15–16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971).[3]

■ The Supreme Court teaches that this exercise of discretion involves certain functional parameters:

[D]iscretion imports not the court's "inclination, but . . . its judgment; and its judgment is to be guided by sound legal principles." Discretion is vested not for purposes of "limit[ing] appellate review of trial courts, or . . . invit[ing] inconsistency and caprice," but rather to allow the most complete achievement of the objectives . . . attainable under the facts and circumstances of the specific case.

*Franks v. Bowman Transportation Co.*, 424 U.S. 747, 770–71, 96 S.Ct. 1251, 1267, 47 L.Ed.2d 444 (1976), *quoting Albermarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). And in a recent delineation of the proper appellate role for reviewing exercise of discretion, this court stated that an improper use of discretion exists only when the judicial action is arbitrary, fanciful, or unreasonable, or when improper standards, criteria, or procedures are used. *Lindy Bros. Builders,*

---

**2.** The three-judge district court that considered the eight alleged violations has now been dissolved. In its stead a single district judge, the Honorable Murray Schwartz, has been appointed. Thus, under the view expressed by the dissent, Judge Schwartz would undoubtedly have to hear *de novo* all the evidence regarding the alleged violations and then determine, anew, whether there is sufficient evidence to support the findings regarding these alleged violations.

**3.** That the remedy was promulgated by a three-judge court instead of a single judge need not detain us. Even where the convening of a three-judge court was unnecessary, *see, e. g., Board of Regents v. New Left Education Project*, 404 U.S. 541, 92 S.Ct. 652, 30 L.Ed.2d 697 (1972), the critical jurisprudential effect is that appeal lies to this court. *See Phillips v. United States*, 312 U.S. 246, 61 S.Ct. 480, 85 L.Ed. 800 (1941); *Moody v. Flowers*, 387 U.S. 97, 104, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967).

*Inc. v. American Radiator and Standard Sanitary Corp.*, 540 F.2d 102, 115–16 (3d Cir. 1976) (in banc).

■ Thus, our task on review is not to substitute the remedy we would have imposed had we been the district court; rather, it is to determine whether the district court observed promulgated guidelines.

### B.

The sound legal principles that govern the remedy in this case have been enunciated by the Supreme Court.[4] The Supreme Court's school desegregation opinions have consistently emphasized the basic and universal remedial purposes of a desegregation order as well as the intensely practical and unique character of each such order. At the same time the Court has set certain outer limitations upon the exercise of remedial discretion in school desegregation cases.

■ The guiding purpose of a remedial order in a case such as this is to eliminate unconstitutional racial discrimination "root and branch". *Green v. County School Board*, 391 U.S. 430, 438, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). The school system and its students are to be returned, as nearly as possible, to the position they would have been in but for the constitutional violations that have been found.

■ While the purposes of such a remedy are broad, the details of its structure must necessarily be specific. The plan adopted should be one that promises "realistically to work" in overcoming the effects of discrimination. *Green v. County School Board, supra*, 391 U.S. at 439, 88 S.Ct. 1689. "Having once found a violation, the district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation. . . . The measure of any desegregation plan is its effectiveness." *Davis v. Board of School Commissioners*, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577

(1971). The realities and practicalities of each particular case are necessarily matters within the trial court's discretion.

■ While the unique character of every school system has prevented the Supreme Court from promulgating detailed rules concerning what a court *must do* to remedy a constitutional violation, the Supreme Court has specified what a court *may not* do in such a case. A court is not at liberty to issue orders merely because it believes they will produce a result which the court finds desirable. The existence of a constitutional violation does not authorize a court to seek to bring about conditions that never would have existed even if there had been no constitutional violation. The remedy for a constitutional violation may not be designed to eliminate arguably undesirable states of affairs caused by purely private conduct (*de facto* segregation) or by state conduct which has in it no element of racial discrimination. This much is settled by *Milliken v. Bradley, supra. See also Spencer v. Kugler*, 404 U.S. 1027, 92 S.Ct. 707, 30 L.Ed.2d 723 (1972), *affirming* 326 F.Supp. 1235 (D.N.J.); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450. Nor may a remedial desegregation order require "as a matter of substantive constitutional right, any particular degree of racial balance or mixing . . . The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole." *Swann v. Board of Education, supra*, 402 U.S. at 24, 91 S.Ct. at 1280. If that language were not clear enough, the Supreme Court has more recently repeated that "[t]he clear import of this language from *Swann* is that desegregation, in the sense of dismantling a dual school system, does not require any particular racial balance in each 'school, grade or classroom.'" *Milliken v. Bradley*, 418 U.S. at 740–41, 94 S.Ct. at 3125 (footnote omitted). These are

---

4. We note that Congress has declared, *inter alia*, as "the policy of the United States," that "all children enrolled in public schools are enti-

tled to equal educational opportunity without regard to race, color, sex or national origin . . . ." 20 U.S.C. § 1701(a).

limitations by which a trial court must abide.

■ The task of a remedial decree in a school desegregation case is simply to correct the constitutional violation and to eradicate its effects. "As with any equity case, the nature of the violation determines the scope of the remedy." *Swann v. Board of Education, supra,* 402 U.S. at 16, 91 S.Ct. at 1276.

### III.

■ Formulating a realistic, practical, and effective remedy is a job peculiarly within the province of the trial court, whose position gives it a quantum advantage over an appellate court in weighing the "practicalities of the situation". It is primarily for this reason that we defer to the trial court's exercise of remedial discretion when it has applied proper legal precepts and remained within determined legal boundaries. *See Lindy Bros., supra,* 540 F.2d at 116. Perhaps not all of the judges on this court would have promulgated the remedy prescribed by the district court. But given the nature of the judicial system—in Roscoe Pound's formulation, "a body of traditional ideas as to how legal precepts should be interpreted and applied and causes decided, and a traditional technique of developing and applying legal precepts"[5]—this court is required to follow a narrow compass.[6] Viewed in this context, we cannot say that the result ordered by the district court was a misuse of discretion.

■ Although we find no misuse of discretion in the basic concept of the remedy, we are disturbed by language in the district court's opinion which can be interpreted as requiring an enrollment of 10–35% black students in each grade. 416 F.Supp. at 356–57. The district court explained this language as follows: "We do not propose the imposition of definitive racial quotas for particular schools. . . . What we set forth here is not a determination of a 'quota'. Rather, it is a statement of what will be considered a desegregated school upon any necessary review of actual assignments made by local officials." *Id.* at 356. Although we accept the district court's explanation that no definitive racial quota was intended, we also believe that this aspect of its opinion might be misunderstood. The Supreme Court has clearly stated that "desegregation, in the sense of dismantling a dual school system, does not require any particular racial balance in each 'school, grade, or classroom.'" *Milliken v. Bradley, supra,* 418 U.S. at 741, 94 S.Ct. at 3125. We are not free to ignore that statement. Accordingly, and to avoid any possible misunderstanding, we expressly disapprove the 10–35% enrollment criterion, and we specifically hold that no particular racial balance will be required in any school, grade, or classroom.

For the reasons set forth in Part II, *supra,* we affirm the basic concept of the remedy ordered by the district court. Those portions of the district court opinion capable of a meaning at variance with the principles stated in Part II, *supra,* are not embraced by this court; those portions of the district court's opinion capable of being construed as inconsistent with Part II, *supra,* will be modified so as to remove the possibility of inconsistency or ambiguity.

### IV.

■ In ordering reorganization or consolidation of the New Castle County school districts, the district court stressed that "the State Legislature and the State Board of Education may take such steps as are not violative of constitutional rights to change the pattern set here," 416 F.Supp. at 357, and ordered creation of an interim board to operate the schools "for so long as the State takes no action." *Id.* We specifically af-

---

5. Pound, *The Theory of Judicial Decision,* 36 Harv.L.Rev. 641, 645 (1923).

6. We note also that a reviewing court may approve the judgment of a reviewed court without embracing its *ratio decidendi*: "[W]e

may affirm a judgment of the district court if the result is correct even though our reasoning be inconsistent with that of the trial court." *Rhoads v. Ford Motor Co.,* 514 F.2d 931, 934 (3d Cir. 1975).

firm this governance plan and emphasize that prompt compliance by the state may make action by the interim board unnecessary. Moreover, we do not mandate any specific number of districts which the state may create within the area presently encompassed by the defendant districts nor do we require that all the existing districts be reconstituted. We do caution that a "Wilmington only" plan will not be adequate. We add one additional provision. We shall require State authorities to file with the district court within 60 days from the date hereof a formal report of its efforts to carry out the mandate of the district court.

## V.

To eliminate the necessity for additional proceedings in the district court, we now set forth the specific order to be entered upon the return of the mandate of this court:

### JUDGMENT

For the reasons set forth in the opinion of the Court of Appeals for the Third Circuit, filed May 18, 1977 and Parts VI, VI A, VI C, VII, VII A, VII B, VII C, VII D, VIII, IX, IX B, and IX C of the Opinion of this Court issued May 19, 1976,

IT IS HEREBY ORDERED AND DECREED:

1. (a) That this action shall be maintained as a class action, and the class shall consist of all black and Hispanic children presently enrolled in the Wilmington, Delaware School system, and that the representation of the Intervening Plaintiffs Pacheco, Rodriguez, et al., is limited to the protection of the interests of the Hispanic students who are members of the class, in receiving bilingual education;

(b) That the class so defined shall be represented by the named plaintiffs before the Court who are members of the class, through their parents, legal guardians, or next friends;

2. That the schools in that area of Delaware north of the northern line of the Appoquinimink School District; that is, the area presently comprised of the Alfred I. duPont, Alexis I. duPont, Clay-

mont, Conrad, DeLaWarr, Marshallton-McKean, Mount Pleasant, Newark, New Castle-Gunning Bedford, Stanton, and Wilmington School Districts, shall be desegregated in accordance with the Opinion of the Court of Appeals for the Third Circuit, and shall be reorganized into a new or such other new districts as shall be prescribed by the state legislature or the State Board of Education, so long as such prescription shall comply with that opinion, thereby eliminating the dual school system (379 F.Supp. 1218, 1223) and the vestige effects of de jure segregation;

3. The State Board of Education or other appropriate State authority shall file a formal report in accordance with Part IV of the Opinion of the Court of Appeals of the Third Circuit within 60 days from May 18, 1977 (date of filing this opinion);

4. The State Board of Education shall, if the state legislature or the State Board of Education do not promptly comply with paragraph 2 of this Order:

(a) Appoint a board of five members (the "New Board") to oversee the operation of the schools of the area as defined in ¶ 2 of this Order, such members to be appointed so that one member of the New Board shall be a member of the present Newark School Board; one member of the New Board shall be a member of the present Wilmington School Board; one member of the New Board shall be a member of either the present New Castle-Gunning Bedford, or DeLaWarr or Conrad School Boards; one member of the New Board shall be a member of the present Stanton, Marshallton-McKean, or Alexis I. duPont School Boards; and one member of the New Board shall be a member of either the present Alfred I. duPont, Mount Pleasant or Claymont School Boards; and that the members of the New Board so appointed shall serve until their successors are selected and duly qualified:

(b) Cooperate and assist the New Board in all planning and operational phases of the implementation of a plan which shall be designed to desegregate the schools in accordance with the Opinion of the Court of Appeals;

(c) Exercise appropriate supervision of the New Board or its successor or successors and its exercise of authority;

(d) Set a date certain for the transfer of full responsibility for the operation of the schools to the New Board or such successor or successors designated by state law; such date to be prior to September 1, 1977;

(e) Be responsible, together with the presently existing boards, for any expenses created by the operation of the New Board or its successor or successors until such time as the New Board or its successor or successors, in a transfer of authority, receive taxing power, in accordance with ¶ 4(d) hereof, and state law;

5. The New Board or its successor or successors shall:

(a) Commence immediately upon appointment to consider any necessary planning for the transfer to it of operating authority;

(b) Prepare a plan for the operation of unitary desegregated schools, in accordance with the Opinion of the Court of Appeals;

(c) Accept responsibility for the operation of the schools, beginning with the Fall, 1977 term, in accordance with a timetable to be set by the State Board of Education;

6. The existing boards of the present school districts shall assist in the transfer of authority, and shall be liable together with the State Board for the expenses of the New Board or its successor or successors, until such time as the New Board or its successors receive taxing authority, in accordance with ¶ 4(d) hereof, and state law; the aforesaid expenses of the New Board shall be borne by the existing boards of the present school districts and by the State Board; each existing board's contribution being assessed in proportion to the ratio which the assessed value of taxable property in that present school district bears to the total assessed value of taxable property in all districts; provided, however, that each existing board's contribution shall be reduced from the aforesaid sum by virtue of the State Board's required contribution, which contribution shall equal the largest contribution required from any of the local boards;

7. The State Board, in cooperation with the existing local districts, may assign members of the professional staff of the Department of Public Instruction or the local districts, to assist the New Board during the period prior to September, 1977;

8. Upon the transfer of full authority to the New Board or its successors, the present boards shall, in accordance with state law, cease to exist;

9. The provisions of Paragraphs 1 through 8 of this Order in accordance with VII D of the Opinion of this Court of May 19, 1976, shall be inapplicable to the New Castle County Vocational-Technical School District;

10. The application of the plaintiff class for an injunction to restrain the payment by the State of any subsidy for the transportation of students to private schools is denied;

11. The provisions of Paragraphs 2 and 8 of this Order shall be stayed in accordance with VI C of the Opinion of this Court of May 19, 1976; and

12. The three-judge panel convened for the purpose of considering the above matters is dissolved, and supervisory jurisdiction will remain in the District Court, in accordance with provision IX C of the Opinion of May 19, 1976 and the mandate of the Court of Appeals for the Third Circuit in *Evans v. Ennis*, 281 F.2d 385, 391 n. 1 (1960).

As so modified, the judgment of the district court will be affirmed. The mandate of the court will issue forthwith.

GARTH, Circuit Judge, with whom RO-SENN and JAMES HUNTER, III, Circuit Judges, join, dissenting:

I regret that I cannot join the majority in this case. The modified order which the majority has affirmed commands Delaware officials[1] to "desegregate" the schools of northern New Castle County[2] "in accordance with the Opinion of the Court of Appeals for the Third Circuit . . . ." But neither the modified order nor the majority opinion reveals what "desegregation" requires in this case. Neither addresses the following two critical issues: 1. what are the interdistrict violations, if any, with which we are concerned and 2. what effects, if any, do those violations now have on the racial composition of the schools of northern New Castle County? I do not believe that it makes sense for the federal courts to order Delaware officials to "desegregate" the schools of northern New Castle County until the courts have resolved these two issues. As a result, I must respectfully dissent from the decision reached by the majority.

I believe that this Court should specify which of the eight interdistrict violations are to be remedied. After we have made that determination, we should remand this case to the district court so that the continuing effects of any such interdistrict violations can be assessed.[2a] While I sympathize fully with the majority's obvious desire to bring this already protracted litigation to a close, I do not believe that there is any shortcut around the procedure which I have outlined. Indeed, I am afraid that the path taken by the majority will have the effect of prolonging this litigation rather than of shortening it.

## I.

I must confess that if I were a Delaware official charged with desegregating the schools of northern New Castle County "in accordance with the Opinion of the Court of Appeals for the Third Circuit," I would not know where to begin.

---

1. Throughout this opinion I have used the term "Delaware officials" to refer to the various state and local bodies and officials which, under the modified order, are given the responsibility of implementing a plan of desegregation. These officials and bodies include the state legislature, the State Board of Education, and the new school board which may be created under paragraph 4(a) of the modified order.

Under the modified order, the responsibility for desegregating the affected schools rests in the first instance with the state legislature and the State Board of Education. Modified Order at para. 2.

If the state legislature and the State Board of Education do not effectuate desegregation "promptly", the responsibility shifts to the new five-member board of education described in paragraph 4(a) of the modified order. Four of the five members of this new board are to be members of the current boards of education of *defendant* school districts. One is to be a member of the current board of education of the Wilmington School District, which is a plaintiff in this action.

2. I have used the term "northern New Castle County" to refer to the eleven school districts listed in paragraph 2 of the modified order.

2a. The majority suggests that if this Court were to remand this case to the district court for further findings, an "unsolvable problem"

would result. Maj.Op. at 378. It notes that the three-judge district court to which this case was previously assigned has been dissolved and that the case has been reassigned to a single district court judge who did not sit on the three-judge court. *Id.* The majority therefore concludes that the new district court judge *"would undoubtedly have to hear de novo all the evidence concerning the alleged violations." Id.* I can not agree. On remand, the single district court judge, in the sound exercise of his discretion, could make the required findings on the present record or he could supplement that record by taking additional evidence, an action which under my view of the case would be required regardless of the identity of the fact finder. He clearly would not be compelled to rehear evidence already in the record. *Cf. Group Assoc. Plans, Inc. v. Colquhoun,* 151 U.S.App.D.C. 298, 466 F.2d 469, 472 (1972) (similar directions given where case remanded to district court for additional findings of fact after original district court judge had died); Fed.R.Civ.Proc. 63; 7 J. Moore, Federal Practice ¶ 63.04 (2d Ed. 1975); 11 C. Wright & A. Miller, Federal Practice & Procedure § 2922 (1973). In any event, the administrative decision made by the District Court for the District of Delaware to assign this case to a new district court judge cannot be permitted to influence the disposition of this appeal.

The majority opinion correctly observes that the remedy in this case must return the "school system and its students . . ., as nearly as possible, to the position they would have been in *but for the constitutional violations that have been found.*" (Emphasis added.) Maj.Op. at 379. *See also Austin Independent School District v. United States,* 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976) (Powell, J., concurring); *Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 434, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976); *Hills v. Gautreaux,* 425 U.S. 284, 293–94, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976); *Milliken v. Bradley,* 418 U.S. 717, 744–45, 746, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); *Swann v. Board of Education,* 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 544 (1971). However, the majority opinion does not identify those interdistrict violations which have been found in this case and which require a remedy. It interprets the Supreme Court's summary affirmance, *Buchanan v. Evans,* 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975), to mean that "one or more interdistrict constitutional violations"[2b] occurred. Maj.Op. at 377. But the district court identified *eight* separate interdistrict violations, *viz.,* 1. the enactment of Educational Advancement Act of 1968 [EAA],[3] 2. The location of public housing projects,[4] 3. state subsidies for the interdistrict transportation of students attending private schools,[5] 4. the establish-

ment by the Wilmington school board of optional attendance zones,[6] 5. the recordation of deeds containing racially restrictive covenants,[7] 6. portions of the Federal Housing Administration's mortgage underwriting manual,[8] 7. portions of the Delaware Real Estate Commission handbook,[9] and 8. the interdistrict transportation of students attending all-black or all-white schools prior to *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).[10]

The majority does not reveal which of these violations it believes the Supreme Court affirmed. Nor does it explain what has become of the remaining violations. If those violations were not affirmed by the Supreme Court, then obviously they are before this Court in this appeal. The majority, however, has failed to address this question. I do not understand how the Delaware officials can possibly devise a plan to remedy the continuing effects of past interdistrict violations when the majority has failed to disclose the identity of the violations which the Supreme Court affirmed.[10a]

Even if it is assumed *arguendo* that *all* eight interdistrict violations have been properly established, the Delaware officials would still be unable to determine what "desegregation" means in the context of this case until the courts determine what the continuing effects of those violations are. As I have noted, the proper remedial

---

**2b.** The majority's failure even to indicate how many violations must be remedied illustrates the impossible nature of the task facing the Delaware officials who must develop a plan to remedy the continuing effects of those violations, without ever knowing the identity of the particular violations affirmed.

**3.** *Evans v. Buchanan,* 393 F.Supp. 428, 438–46 (D.Del.1975).

**4.** *Id.* at 435.

**5.** *Id.* at 436–37.

**6.** *Id.* at 435–36.

**7.** *Id.* at 434.

**8.** *Id.*

**9.** *Id.* at 434–35.

**10.** *Id.* at 433–34.

**10a.** The majority states that "[i]f the defendants believe that some of the eight alleged violations were not affirmed [by the Supreme Court] they should take, or perhaps previously should have taken, appropriate steps to obtain review of this matter, or a clarification, by the Supreme Court." Maj.Op. at 377. The majority opinion does not reveal, however, those additional steps it believes that the defendants should have taken in order to obtain clarification from the Supreme Court. The defendants did file a petition for rehearing, but the Supreme Court denied their petition. 423 U.S. 1080, 96 S.Ct. 868, 47 L.Ed.2d 91 (1976). We recognize, as the defendants undoubtedly do, that Sup.Ct.Rule 58(4) provides: "Consecutive petitions for rehearings . . . will not be received."

goal is to return the "school system and its students . . ., as nearly as possible, to the position they would have been in but for the constitutional violations that have been found." Maj.Op. at 379. In this case, however, the district court never attempted to ascertain what the racial composition of the schools of northern New Castle County would be but for the constitutional violations which it identified. Instead, the district court appears to have proceeded upon the assumption that the proper remedial goal was to achieve a particular degree of racial balance thought to be socially or educationally desirable,[11] *viz.*, 10% to 35% black students and 65% to 90% white students. The majority opinion rejects the district court's statistical guidelines,[12] but it fails to remand the case to the district court so that the continuing effects of any valid interdistrict violations can be ascertained. I do not see how the Delaware officials can devise a plan to remedy the continuing effects of past interdistrict violations until the extent of those effects is determined by the court. After all, it is by no means obvious what the racial composition of the affected schools would be at present if the eight violations found by the district court had not occurred. One could argue in good faith that but for those violations the ratio of black students to white students would be approximately the same in all the affected schools. One could also argue in good faith that even if those eight violations had never occurred, the racial composition of the affected schools would not be appreciably different from what it is today. I do not see how a proper remedial plan can be developed until the court assesses the continuing effects of any valid interdistrict violations. Until such an assessment is made, it will be impossible to determine whether or not the required causal connection exists between the violations and the remedies which the parties may propose.

In short, the majority opinion is disturbingly similar to an opinion in a tort case in which the defendant is told by the court: "You have committed a tort against the plaintiff, but we will not tell you what that tort was. Nor will we tell you what the plaintiff's damages are. *You* decide what tort you think you committed, and *you* determine what the plaintiff's damages are. If you cannot—or if your damages do not satisfy the plaintiff—then we will step in." It seems to me that this is a curious procedure indeed.

The majority's failure to address the two critical questions which I have noted is almost certain to result in prolonging this litigation still further, for the plain fact is that the modified order and the majority opinion do not effectively require the alteration of the present school district lines or the reassignment of any students. The modified order and the majority opinion do not require any particular racial balance in the affected schools. Maj.Op. at 379. Nor do they require the creation of any particular number of districts. Modified Order at para. 2. Since the majority opinions states that the Supreme Court affirmed the existence of "one or more" interdistrict violations, the defendants could quite reasonably interpret the modified order and the majority opinion to mean that only one violation was affirmed by the Supreme Court and that only that violation need be remedied. The defendants could argue—as I have (*see* part II A *infra*)—that the violation affirmed by the Supreme Court was the enactment of the Educational Advancement Act. Since portions of the EAA were held to be discriminatory because they precluded the State Board of Education from *considering* the desirability of consolidating all or part of Wilmington with nearby districts,[13] the defendants could quite reasonably take the position that the continuing effects of this violation can be remedied simply by requiring the State Board to *consider* whether it would be educationally desirable to consolidate Wilming-

---

**11.** *Evans v. Buchanan*, 416 F.Supp. 328, 355–57 (D.Del.1976). *See* in particular the text accompanying notes 138, 146, and 147.

**12.** Maj.Op. at 379.

**13.** *Evans v. Buchanan*, 393 F.Supp. 428, 442 (D.Del.1975).

ton with nearby districts and by empowering the State Board to effect such consolidations if it determines that they are beneficial. If the defendants take this position then the plaintiffs will undoubtedly challenge their actions in the district court, and that challenge will soon find its way back to this Court. We will then be forced to deal with the two issues which the majority has refused to address today. In the interim, still more time will have been lost.

## II.

I therefore believe that this Court is required at this time to consider the validity of the eight interdistrict violations found by the district court. I have briefly sketched out below the manner in which I would dispose of this issue.

## A.

In considering the validity of the eight interdistrict violations found by the district court, the first question which must be faced is the effect of the Supreme Court's summary affirmance. I am convinced that only one interdistrict violation was affirmed by the Supreme Court. In my view, that violation was the enactment of the EAA.

The Supreme Court's summary affirmance grew out of the following sequence of events. On March 27, 1975, after the completion of hearings on the question of whether any interdistrict violations had occurred,[14] the three-judge district court issued an opinion in which it identified eight such violations. *Evans v. Buchanan*, 393 F.Supp. 428 (D.Del.1975). On April 16, 1975, the court entered an order based upon the findings contained in that opinion. The order 1. required the parties to submit

both interdistrict desegregation plans and plans which affected only the Wilmington schools and 2. enjoined the State Board of Education, in preparing its interdistrict plans, from relying upon the provisions of the EAA which the district court had found to be unconstitutional. The defendants took an appeal from this order to the Supreme Court under 28 U.S.C. § 1253 (1970), which gives the Supreme Court jurisdiction to hear an appeal "from an order granting or denying . . . an interlocutory or permanent injunction in any civil action, suit or proceeding required by any Act of Congress to be heard and determined by a district court of three judges." The Supreme Court summarily affirmed without issuing an opinion. *Buchanan v. Evans, supra.*[15]

In determining the effect of the Supreme Court's summary affirmance, we obviously cannot assume that the Supreme Court approved the reasoning in the district court's opinion. *Fusari v. Steinberg*, 419 U.S. 379, 391, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975) (Burger, C. J., concurring). Rather, we must attempt to determine those conclusions which the Supreme Court *must* have reached in order to have disposed of the appeal as it did. In making this determination, it will be helpful to consider separately each of the two parts of the district court's order.

*The portion of the order of April 16, 1975, which forbade reliance upon certain provisions of the EAA.*

The defendants suggest that the Supreme Court need not have concluded that certain provisions of the EAA were unconstitutional in order to have affirmed the portion of the order of April 16, 1975, which forbade

---

**14.** *See Evans v. Buchanan*, 393 F.Supp. 428, 430–31 (D.Del.1975).

**15.** Thereafter, the district court conducted evidentiary hearings on the remedial plans submitted by the parties. The district court issued an opinion which discussed the remedial aspect of this case. *Evans v. Buchanan*, 416 F.Supp. 328 (D.Del.1976). It then entered the order from which the present appeal was taken. In addition to taking an appeal to this Court under 28 U.S.C. § 1291 (1970), the defendants also

sought once again to appeal directly to the Supreme Court under 28 U.S.C. § 1253 (1970). However, the Supreme Court dismissed their appeals for want of jurisdiction [*Del. State Bd. of Educ. v. Evans*, 429 U.S. 973, 97 S.Ct. 475, 50 L.Ed.2d 579 (1976)], apparently because a three-judge court had not been required after the injunction against the enforcement of the EAA had been issued. *See* Memorandum for the United States as Amicus Curiae at 6–7, *Del. State Bd. of Educ. v. Evans, supra.*

reliance upon those provisions. The defendants argue that this portion of the district court's order constituted a preliminary injunction. They then observe that a district court can issue a preliminary injunction against the enforcement of a statute challenged as unconstitutional without concluding that the statute is invalid. The district court, they note, need only determine that "serious questions" concerning the Act's constitutionality have been raised and that the other prerequisites for preliminary injunctive relief have been satisfied. *Mayo v. Canning Co.*, 309 U.S. 310, 316, 60 S.Ct. 517, 84 L.Ed. 774 (1940). *See also Brown v. Chote*, 411 U.S. 452, 456, 93 S.Ct. 1732, 36 L.Ed.2d 420 (1973). If the district court grants the preliminary injunction and an appeal is taken, the appellate court's review, they argue, is limited to determining whether the district court abused its discretion in reaching the conclusions which it did. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931–32, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); *Brown v. Chote, supra*, 411 U.S., at 457, 93 S.Ct. 1732; *Oburn v. Shapp*, 521 F.2d 142, 147 (3d Cir. 1975). In sum, the defendants suggest that when the Supreme Court affirmed the portion of the district court order forbidding reliance upon portions of the EAA, the Court determined only that the district court had not abused its discretion in determining that the plaintiffs' showing raised "serious questions" concerning the constitutionality of those provisions. R. Wolfson & P. Kurland, Robertson and Kirkham Jurisdiction of the Supreme Court of the United States § 196 (1951).

If the defendants were correct in characterizing the portion of the order with which we are now concerned as a preliminary injunction, then the result which they urge would follow. I am persuaded, however, that that portion of the order must be viewed as a permanent, rather than a preliminary, injunction even though it formed part of a non-final, "interlocutory" order.[16]

A preliminary injunction is an injunction "issued to protect plaintiff from irreparable injury and to preserve the court's power to render a meaningful decision after a trial on the merits." 11 C. Wright and A. Miller, Federal Practice and Procedure § 2947 at 423 (1973). The granting or denial of an application for a preliminary injunction "does not involve a final determination on the merits." *Benson Hotel Corp. v. Woods*, 168 F.2d 694, 696 (8th Cir. 1948). As Judge Jerome Frank once wrote:

> [A] preliminary injunction—as indicated by the numerous more or less synonymous adjectives used to label it—is, by its very nature, interlocutory, tentative, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive, characterized by its for-the-time-beingness. It serves as an equitable policing measure to prevent the parties from harming one another during the litigation; to keep the parties, while the suit goes on, as far as possible in the respective positions they occupied when the suit began.

*Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 742 (2d Cir. 1953). Preliminary injunctions are typically issued after an abbreviated hearing. 7 J. Moore, Federal Practice ¶ 65.04[3] (2d ed. 1975); 11 C. Wright & A. Miller § 2949 (1973); Develop-

---

**16.** It is not unusual for a permanent injunction to be contained in a non-final, "interlocutory" order. *See, e. g., Hook v. Hook & Ackerman, Inc.*, 213 F.2d 122 (3d Cir. 1954); *Fidelity Trust Co. v. Bd. of Educ.*, 174 F.2d 642 (7th Cir. 1949); 7 J. Moore, Federal Practice ¶ 65.21 at 152 n. 16 (2d ed. 1975). This point may be obscured by the fact that the term "interlocutory" has at least two quite distinct meanings. Orders which are not "final" under 28 U.S.C. § 1291 (1970) are often referred to as "interlocutory." *See, e. g.,* 28 U.S.C. § 1292 (1970); 9 J. Moore, Federal Practice ¶ 110.08[1] at 111 (2d ed. 1975). In addition, prior to the enactment of the Federal Rules of Civil Procedure (and in

some jurisdictions today), the term "interlocutory injunction" was used to refer to the type of injunction labelled "preliminary" in the Federal Rules. *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 742 (2d Cir. 1953); Note, Developments in the Law—Injunctions, 78 Harv.L.Rev. 994, 1055 & n. 3 (1965). For surviving examples of this usage, *see* 28 U.S.C. § 1253 (1970); Supreme Court Rule .15(g). Since these two meanings of the term "interlocutory" are quite distinct, there is no reason why an injunction contained in an "interlocutory" (i. e. non-final) order need be an "interlocutory" (i. e., preliminary) injunction.

ments in the Law—Injunctions, 78 Harv.L. Rev. 994, 1055 (1965). And in appropriate circumstances, they may be granted based solely upon the parties' affidavits. *Wounded Knee Legal Defense/Offense Committee v. FBI*, 507 F.2d 1281, 1286–87 (8th Cir. 1974); *K–2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1088 (9th Cir. 1972); *Industrial Electronics Corp. v. Cline*, 330 F.2d 480, 483 (3d Cir. 1964).

By contrast, "[a] permanent injunction is ordinarily issued only 'after a full trial on the merits.'" *Chappell & Co. v. Frankel*, 367 F.2d 197, 203 (2d Cir. 1966). The granting or denial of a request for a permanent injunction obviously constitutes an adjudication on the merits.

In this case, when the district court determined that certain provisions of the EAA were unconstitutional and embodied that decision in the order of April 16, 1975, there was nothing "tentative, provisional, ad interim, impermanent, [or] mutable" about that decision. At the pretrial conference, the district court had decided to bifurcate the proceedings. *Evans v. Buchanan*, 379 F.Supp. 1218, 1220 n. 1 (D.Del.1974). The first stage was to concern whether any constitutional violations had occurred. If such violations were found, the second stage was to concern the appropriate remedy. *Id.* When the district court entered the order of April 16, 1975, it had completed the first stage of the bifurcated proceeding. A full trial had been held on the question of whether any interdistrict violations had occurred, and the court had satisfied itself that certain provisions of the EAA *were* unconstitutional, not that the plaintiffs had raised "serious questions" concerning their constitutionality. As a result, it seems to me that the portion of the order of April 16, 1975, which forbade reliance upon certain parts of the EAA must be regarded as a permanent rather than a preliminary injunction. Consequently, when that portion of the order came before the Supreme Court on appeal, it must have been tested against the standard of review applicable to a permanent injunction enjoining enforcement of a statute held unconstitutional. That standard of review is whether the lower court committed legal error in determining that the statute was unconstitutional. *See, e. g., Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). Since the Supreme Court affirmed the portion of the order of April 16, 1975, which prohibited reliance upon certain provisions of the EAA, the Court must necessarily have concluded that the district court did not err in holding the EAA unconstitutional in part. And since the provisions of the EAA struck down by the district court obviously affected more than one school district, the Supreme Court's summary affirmance necessarily meant that the enactment of the EAA constituted an interdistrict violation.

The defendants also argued strenuously that even if the Supreme Court's summary affirmance established the unconstitutionality of portions of the EAA, that determination was overruled by the Supreme Court's subsequent decisions in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), and *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Based upon a comparison of the district court's opinion of May 27, 1975, and the Supreme Court's opinions in *Washington v. Davis* and *Village of Arlington Heights,* it seems clear that the defendants' argument merits serious consideration.[17] Nevertheless, I agree with the majority that it is the province of the

---

17. *Compare Village of Arlington Heights v. Metropolitan Housing Dev. Corp., supra,* at 264–267, 97 S.Ct. 555 *with Evans v. Buchanan,* 393 F.Supp. 428, 439 (D.Del.1975). *See also Bd. of School Comm'rs v. Buckley,* 429 U.S. 1068, 97 S.Ct. 802, 50 L.Ed.2d 786 (1977), *vacating, United States v. Bd. of School Comm'rs.,* 541 F.2d 1211 (7th Cir. 1976); *Austin Ind. School Dist. v. United States,* 429 U.S. 990, 97 S.Ct.

517, 50 L.Ed.2d 603 (December 7, 1976), *vacating,* 532 F.2d 380 (5th Cir. 1976).

It could be argued that *Washington v. Davis* and *Village of Arlington Heights* do not affect the Supreme Court's ruling on the EAA. *See United States v. Bd. of School Commissioners,* 541 F.2d 1211, 1227 (7th Cir. 1976) (Tone, J., dissenting).

Supreme Court and not of the Court of Appeals to reconsider the Supreme Court's ruling in this case in light of subsequent Supreme Court decisions.

*The portion of the order of April 16, 1975, which required the preparation of inter- and intradistrict plans.*

It is not completely clear whether the Supreme Court's summary affirmance even reached the portion of the district court's order which required the submission of inter- and intradistrict plans.[18] Fortunately, the answer to that question has no effect on the outcome of this appeal.

If the only portion of the district court order which was before the Supreme Court was the part which prohibited reliance upon the EAA, then obviously the only interdistrict violation which the Court affirmed was the enactment of the EAA. If, on the other hand, both segments of the order of April 16, 1975, were before the Supreme Court, the same conclusion follows. Once the Supreme Court determined that the enactment of the EAA constituted an interdistrict violation, it followed *a fortiori* that the district court had not erred in ordering the submission of inter-, as well as intradistrict plans. As a result, the Court had no occasion to inquire into the validity of any of the other seven interdistrict violations found by the district court.

**B.**

Since, under my analysis, the Supreme Court's summary affirmance reached only one of the eight interdistrict violations found by the district court, the validity of the other seven violations is before this Court in this appeal. At this time, I would not affirm the district court's findings concerning these seven violations. Instead, I would remand this case to the district court so that it could determine whether each of those violations is supported by the "racially discriminatory intent or purpose"[19] required by *Washington v. Davis* and *Village of Arlington Heights.*

The district court opinion in which the interdistrict violations were set out was issued more than one year before *Washington v. Davis* was decided. As a result, the district court did not make findings of fact concerning the intent or purpose behind each of the eight violations of the Equal Protection Clause which it identified.

With respect to three of the seven violations now before this Court—the FHA mortgage underwriting manual, the Delaware Real Estate Commission handbook, and the pre-*Brown* interdistrict busing—the existence of a racially discriminatory intent appears so obvious that the district court's failure to make specific findings concerning

---

**18.** As the three Supreme Court justices who dissented in *Buchanan v. Evans, supra,* pointed out, it is not completely clear whether the Supreme Court's jurisdiction under 28 U.S.C. § 1253 (1966) is limited to those portions of a three-judge court order which grant or deny an injunction or whether the Court's jurisdiction embraces the entire district court order so long as one portion of it grants or denies an injunction. 423 U.S. at 974–75, 96 S.Ct. 381. If the Supreme Court's jurisdiction under 28 U.S.C. § 1253 (1970) is limited to those portions of the order which grant or deny injunctions, then it is unclear whether the Supreme Court reviewed the portion of the order of April 16, 1975, which required the submission of inter- and intradistrict plans, since it is uncertain whether an order requiring the preparation and submission of desegregation plans constitutes an order granting an "injunction." The Second and Sixth Circuits have held that orders of this type are not orders granting "injunctions" and that therefore they are not appealable under 28 U.S.C. § 1292(a)(1) (1966). *Hart v. Community School Board,* 497 F.2d 1027, 1030 & n. 4 (2d Cir. 1974) (Friendly, J.); *Bradley v. Milliken,* 468 F.2d 902 (6th Cir. 1972), *cert. denied,* 409 U.S. 844, 93 S.Ct. 45, 34 L.Ed.2d 83 (1972) (earlier stage of *Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), litigation); *Taylor v. Bd. of Educ.,* 288 F.2d 600, 604–06 (2d Cir. 1961) (Friendly, J.). The Fifth and Tenth Circuits have reached the opposite result). *Bd. of Educ. v. Dowell,* 375 F.2d 158 (10th Cir. 1967); *Bd. of Public Instruction v. Braxton,* 326 F.2d 616 (5th Cir. 1964). *See also* 9 J. Moore, Federal Practice ¶ 110.20[1] at 234–35 (2d ed. 1975).

**19.** *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

intent might not have required a remand[20] if one were not required for other reasons. On the other hand, the district court's failure to make findings concerning the intent which motivated the other four violations— the location of public housing projects, the recordation of deeds with racially restrictive covenants, the state subsidies for the interdistrict transportation of private school students, and the establishment by the Wilmington School Board of optional attendance zones—does necessitate a remand. Not only did the district court fail to find that these actions were motivated by a racially discriminatory intent, but there is language in the court's opinion which may imply that the court felt that the opposite was true.[21] Moreover, a plausible nondiscriminatory purpose for each of these actions is readily apparent. Consequently, it seems essential that this case be remanded to the district court so that it can make findings concerning the intent or purpose behind these four actions. Since a remand is necessary for this purpose—as well as for the reason explained in part III—the district court should be instructed to make findings concerning the other three violations as well.

### III.

In my view, a remand to the district court is also required so that the district court can determine as precisely as possible what the racial composition of the schools of northern New Castle County would now be if those interdistrict violations found to be valid had not taken place. To put it another way, the district court should determine to what extent the present racial makeup of the affected schools is attributable to acts which violated the Equal Protection Clause and to what extent it is attributable to economic and social forces, to private actions, and to nondiscriminatory governmental actions. After the district court has made that determination, it could then require the parties to submit plans designed to remedy the effects of the constitutional violations.

I recognize that it may not be easy for the district court to determine what the racial composition of the affected schools would now be if no violations had occurred. Nevertheless, the Constitution requires that just such a determination be made, and I am confident that the district court could make a reasonably accurate assessment. In any event, such a determination will have to be made eventually. It seems to me that it is in everyone's interest to have it done as soon as possible.

For the reasons expressed above, I respectfully dissent.

---

**20.** *Richerson v. Jones*, 551 F.2d 918 (3d Cir. 1977); *Estate of Hooper v. Govt. of Virgin Islands*, 427 F.2d 45, 48 (3d Cir. 1970).

