NORTHEAST WOMEN'S
CENTER, INC.

v.

Michael McMONAGLE; Joseph P. Wall; Roland Murkum; Howard Walton; Henry Tenaglio; Stephanie Morello; Annemarie Breen; Ellen Jones; Kathy Long; Susan Silcox; Paul C. Armes; Walter G. Geis; John J. O'Brien; James Codichini; Patricia Walton; Diane Sadler; Miriam Dwyer; Mary Byrne; Linda Corbett; Thomas McIlhenny; Patricia Ludwig; Gerrald Lynch; Margaret Caponi; Deborah Baker; Thomas Herilhy; Pasquale Varallo; John Stanton; Anne Knorr; John Connor; Elliott Stevens; Harry Hand; Laurie Wirfell; Helen Gaytos; Robert Moran; Earl Essex; Patricia McNamara; Donna Andracavage; Juan Guerra; Linda Hearn

Michael McMonagle, Appellant.

Nos. 90-1845, 90-1954, 90-1955.

United States Court of Appeals,
Third Circuit.

Argued May 15, 1991.
Decided July 17, 1991.

Denis V. Brenan (argued), Morgan, Lewis & Bockius, Philadelphia, Pa., Joseph F. Wusinich, Wusinich & Brogan, West Chester, Pa., for appellant.

Julie Shapiro, Edmond A. Tiryak (argued), Philadelphia, Pa., for appellee.

Before HUTCHINSON, COWEN and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge:

This appeal arises from an action brought by a women's health center against a group of anti-abortion activists and from an injunction subsequently imposed on the defendants by the district court. After trial in this action, the jury returned a verdict for the health center on its claims under civil RICO and the state torts of trespass and intentional interference with contract. The district court granted injunctive relief, which it later modified after remand from this court. The instant appeal challenges portions of the modified injunction on constitutional grounds, and challenges the incarceration of appellant McMonagle which was ordered as a coercive measure to induce him to comply with a district court order arising from McMonagle's civil contempt.

Subject matter jurisdiction of this case derives from 28 U.S.C. § 1331 and 18 U.S.C. § 1964. This court has appellate jurisdiction under 28 U.S.C. § 1291.

The primary question on this appeal is whether the district court's injunction is constitutional. For the reasons that follow we believe that, with one exception, the injunction was proper. As to that one aspect of the injunction, however, namely its ban on the defendants' picketing or patrolling within 2500 feet of the residence of any of the plaintiff's employees (*see* ¶ A(9) of the Modified Permanent Injunction), we cannot hold on the record before us that such a provision is sufficiently narrowly tailored to pass constitutional muster. We will therefore modify ¶ A(9) of the injunction and remand to the district court for further factfinding or development of the record on this issue, permitting the district court to revise our modification of the injunction if circumstances not of record before us establish the necessity for a broader zone of protection than we have decreed. We will affirm the district court's injunc-

tion in all other respects, and we will affirm McMonagle's incarceration imposed to induce his compliance with the district court's order to purge his contempt, as well as the district court's denial of McMonagle's motion for a stay of the contempt orders.

I.

Plaintiff-appellee, the Northeast Women's Center, Inc. ("Center"), is a Pennsylvania corporation which provides gynecological services, pregnancy testing, abortions, counseling, and community education in Northeast Philadelphia. Defendant-appellant Michael McMonagle [1] is the leader of a group of anti-abortion protesters who have engaged in numerous actions in and around the premises of the Northeast Women's Center and at the residences of certain of the Center's employees. Over several years, McMonagle and his group have engaged in both legal and illegal activities, the latter including violent, intimidating, and offensive attacks on employees and clients of the Center. As a result of these activities, the Center filed a complaint asserting claims under RICO, the Clayton Act, and state law, alleging illegal and tortious conduct both at the Center and at the homes of some of the Center's employees. The complaint sought declaratory and injunctive relief, as well as damages and attorney's fees.

The Center presented evidence at trial that established that the defendants unlawfully entered the Center's facilities on four occasions, and that they illegally and violently interfered with the activities of the Center by means of both intimidation and physical attacks on patients and employees of the Center. The details of these incidents, which were captured on videotape, are discussed in this court's earlier opinion in this case, *Northeast Women's Center, Inc. v. McMonagle*, 868 F.2d 1342 (3rd Cir.), cert. denied, —— U.S. ——, 110 S.Ct. 261, 107 L.Ed.2d 210 (1989).

---

1. The Center originally sued 42 individuals. Either before or during trial, the Center ultimately dismissed its claims against 11 defendants. The court gave a directed verdict to four defendants, and dismissed one after trial. Of the twenty-six remaining defendants subject to the district court's injunction, Michael McMonagle is the only party to the instant appeal. Related appeals by other defendants, however, are pending at No. 90–1846 and No. 90–1862.

The purpose of the defendants' activities, as is apparent from the activities themselves and as was freely stated by some of the defendants, was to interfere with, and if possible prevent the continued operation of, the Center. As we noted in our earlier opinion, the Center did not challenge the protestors' free speech right to express their views on abortion. Instead, this lawsuit was brought because of the illegal and tortious conduct of McMonagle and his codefendants which damaged the Center and which injured its employees and patients.

The case was tried to a jury in May, 1987. The jury returned a verdict for the Center, finding that the Center had proved that McMonagle and his codefendants had engaged in violent and extortionate conduct. In response to a detailed set of interrogatories, the jury found that McMonagle and 26 others were associated with an enterprise affecting interstate commerce; that they had committed at least two acts of extortion with respect to the clinic and its employees; that the Center had suffered over $40,000 in damages; and that three defendants had intentionally and improperly interfered with the performance of a contract between the Center and its employees.

On June 8, 1987, the district court awarded the Center limited injunctive relief, which barred trespassing and blockading of the Center's offices. On appeal, however, this court noted that the district court had failed to provide injunctive relief "with respect to the acts of harassment and intimidation of the Center's employees and patients." *Northeast Women's Center, Inc. v. McMonagle*, 868 F.2d 1342, 1353 (3rd Cir.1989). We held that the district court had erred in concluding that it could not award injunctive relief for the harassment and intimidation by the defendants, and we

remanded the case for further consideration and action by the district court.

On remand, the Center sought further injunctive restrictions on the defendants' conduct. The district court examined the record and held two further evidentiary hearings. It then found that the defendants had continued to engage in "nonpeaceful activity" at the Center and at the homes of the Center's staff and patients,[2] that such activities would continue, and that such conduct remained a threat to the Center's business and to the well-being of its staff and patients. 745 F.Supp. 1082, 1090, 1094 (E.D.Pa.1990). On August 27, 1990, the court therefore issued a new injunction. This injunction barred, inter alia, "picketing, demonstrating, or using bullhorns or sound amplification equipment at the residences of plaintiff's employees or staff." 745 F.Supp. at 1096, ¶ A(9).[3]

Immediately after the issuance of the August 27, 1990 injunction, McMonagle announced that he would disobey the order by continuing to picket at the homes of certain staff members. He then organized a demonstration at the home of Dr. Ken Lakoff, a staff member of the Center, on August 30, 1990. The Center moved to have McMonagle and three others held in contempt. The court conducted a hearing at which it received testimony and reviewed videotapes of McMonagle's actions. McMonagle testified that his actions would continue. The district court found that McMonagle planned and organized the demonstration, and that the demonstrators "marched directly in front of Doctor Lakoff's home carrying signs ... saying 'Kenneth Lakoff bought *this place* with the blood of unborn children.'" Findings of Fact 3 & 5, App. 69–70 (emphasis supplied by district court). It therefore held McMonagle in contempt of the August 27, 1990 injunction.[4]

---

2. In one such activity, the defendants blocked the driveway of one of the doctors who worked at the Center and prevented him from leaving for work for a period of time.

3. As discussed further below, the court considered certain objections to this injunction raised by McMonagle, and issued a modified injunction on November 1, 1990.

4. The district court found McMonagle in civil contempt on October 4, 1990. On October 15, 1990, McMonagle filed a timely motion for reconsideration of this order. On October 22, 1990, the district court entered an order denying McMonagle's motion for reconsideration of the contempt order. Appeal No. 90–1955 is McMonagle's challenge to the contempt adjudication and the denial of reconsideration thereof.

The district court then ordered McMonagle to file a financial statement and appear at a hearing on October 19, 1990. After the October 19 hearing, the district court ordered McMonagle to pay the Center $1,000 of the $2,873 in attorneys' fees incurred by the Center in securing the contempt order.[5] The court ordered that the $1000 be paid in monthly installments of $100, and that on failure of such payment, McMonagle be imprisoned until such time as he resumed payments. McMonagle, whose financial statement showed a $36,000 annual income as Director of the Pro-Life Coalition of Southeastern Pennsylvania, refused to make the required payments and surrendered himself to the U.S. Marshall on November 2, 1990. He remained in custody until December 10, 1990, at which time the district court *sua sponte* ordered his release as it no longer deemed incarceration to be effective.

On November 1, 1990, the district court ruled on certain objections that McMonagle had raised to the August 27, 1990 injunction. In its ruling, the district court indicated that after consideration of these objections, it believed certain modifications were warranted. The district court therefore issued a modified injunction on November 1, 1990, which remains in effect. The relevant text of the November 1, 1990 Modified Permanent Injunction appears in *Northeast Women's Center, Inc. v. McMonagle,* 749 F.Supp. 695, 698 (E.D.Pa.1990), and is reproduced here as an appendix to this opinion. McMonagle also moved for a stay of the district court's contempt orders, which motion the district court denied on November 2, 1990.

## II.

McMonagle now challenges the constitutionality of the November 1, 1990 modified injunction. He also challenges the finding that he was in contempt of the original August 27, 1990 injunction. McMonagle further challenges the purging actions required of him by the district court, in particular the $1,000 payment toward the Center's attorneys' fees (which McMonagle has never claimed that he is unable to pay). Finally, McMonagle challenges his having been jailed for refusal to make such payment.

McMonagle's appeal from the district court's "Modified Permanent Injunction" of November 1, 1990 is docketed at No. 90–1845. McMonagle's appeal from the denial of his motion for reconsideration of the district court's adjudication that he was in contempt of the August 27, 1990 injunction is docketed at No. 90–1955. McMonagle's appeal from the district court's denial of McMonagle's oral Motion to Stay Incarceration is docketed at 90–1954. These three appeals have been consolidated for argument and disposition.

We have plenary review of the issues of law underlying the district court's injunction, including McMonagle's constitutional challenges to the injunction. However, we review the details of that order only for abuse of discretion. *Roe v. Operation Rescue,* 919 F.2d 857, 871 (3rd Cir.1990). "The fashioning of a remedy is committed to 'the exercise of the district judge's discretion.'" *Evans v. Buchanan,* 555 F.2d 373, 378 (3rd Cir.) (en banc), cert. denied, 434 U.S. 880, 98 S.Ct. 235, 54 L.Ed.2d 160 (1977). We review the denial of a stay of the contempt orders for abuse of discretion only.

We have plenary review of the question whether, as a matter of law, McMonagle's objection to his incarceration is moot, given that he has been unconditionally released, and of the legal question whether the remedy of incarceration is available to a court to coerce a financially able contemnor to pay court-ordered attorney's fees incurred by plaintiff in successfully pursuing civil contempt proceedings.

Our review of the district court's findings of fact is for clear error only. On this appeal, however, McMonagle does not challenge any of the district court's findings of fact, and we do not find any of those factu-

---

**5.** The court also directed McMonagle to perform certain other acts, including issuing a press release and mailings announcing his intention to abide by the terms of the injunction and requesting that his codefendants do the same. McMonagle has not challenged these terms, and therefore they are not before us.

al determinations to be clearly erroneous. In this opinion we will therefore draw on and refer to the facts as found by the district court.

### III.

*A.  Constitutionality of the Injunctive Speech Restrictions at the Center.*

The injunction [6] imposed by the district court included certain restrictions on the defendants' conduct in the vicinity of the Center.[7]  McMonagle challenges these restrictions, characterizing them as prior restraints on speech in violation of the First Amendment, as unconstitutionally vague and overbroad, and as denying equal protection to the defendants and other anti-abortion demonstrators.[8]

McMonagle first challenges the injunctive restrictions as prior restraints on speech.  He raises this claim as to ¶ A(5) of the injunction, which prohibits "singing, chanting" and other "sounds and images" observable to or within earshot of patients inside the Center "during surgical procedures and recovery periods."  He also objects to ¶¶ A(6) and A(7), which he characterizes as creating "a 500 foot speech-free zone" around the center.  Brief of Appellant at 11.  He also objects to ¶ A(8)(f), which prohibits "any other actions which have or reasonably might have the effect of intimidating patients, employees, or staff members," and ¶ A(9), which he characterizes as creating "a 2500 foot First Amendment-free zone around residences."

■  The Center's primary response is that the injunction is a carefully-crafted, reasonable "time, place and manner" restriction on the defendants' expression.  It is well settled that the government may impose reasonable time, place, and manner restrictions on all expression.  *See Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).  Time, place, and manner restrictions are permissible if they " 'are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.' "  *Frisby v. Schultz,* 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1989) (quoting *Perry Educ. Assoc. v. Perry Legal Educ. Assoc.,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983)).[9]  As discussed further below, the district court's injunction, with one narrow exception, meets all of these requirements.

■  The district court found that McMonagle and his group had engaged in acts of violence, intimidation, and trespass.  The right of a court to enter an injunction restricting the form and location of expressive activity is particularly clear in such a context.  *See, e.g., Milk Wagon Drivers v. Meadow Moor Dairies, Inc.,* 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836 (1941) (upholding ban on picketing altogether where peaceful acts had been mixed with contemporaneous violent conduct, so that intimidation had occurred, and as a result even peaceful picketing would have an intimidating effect).  The cases upon which McMonagle bases his free-speech objections to the instant injunction define the contours of the right to free speech for the population at large; [10] by contrast, McMonagle and his

---

6.  In this section, unless otherwise specified, "the injunction" refers to the November 1, 1990 Modified Permanent Injunction, from which McMonagle appeals, as opposed to the original injunction of August 27, 1990.

7.  The relevant text of the district court's injunction is found in the appendix to this opinion.

8.  Although McMonagle ostensibly asserts a denial of equal protection, we do not read his brief as presenting an equal protection argument.  Moreover, our discussion *infra* upholding the district court's injunctive decree in its particular application to those, such as McMonagle, who

have a history of violent and illegal acts, disposes of any such contention.

9.  The "time, place, and manner" restrictions have most recently found expression in *Barnes v. Glen Theatre, Inc.,* —— U.S. ——, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (upholding Indiana's statutory restriction on nude dancing).

10.  In *Frisby v. Schultz,* 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1989), for example, the Supreme Court addressed the constitutionality of a town ordinance of general application, prohibiting *anyone,* not just named defendants, from picketing "before or about the residence or dwelling of any individual."  487 U.S. at 477, 108 S.Ct. at 2498.

codefendants fall into the special category of persons who have been found to have engaged in illegal, violent, and intimidating conduct. In such cases, injunctions similar to the one imposed in this case by the district court have regularly been upheld. *See, e.g., New York State NOW v. Terry,* 886 F.2d 1339 (2d Cir.1989); *Portland Feminist Women's Health Center v. Advocates for Life, Inc.,* 859 F.2d 681 (9th Cir. 1988).

■ McMonagle incorrectly argues that the injunction is a "prior restraint." A prior restraint is a content-based restriction on speech prior to its occurrence. The injunction at issue here is content-neutral. It regulates when, where, and how McMonagle may speak, but not what he may say. The challenged sections of the injunction make no mention whatsoever of abortion or any other substantive issue—they merely restrict the volume, location, timing, and violent or intimidating nature of his expressive activity. In fact, the injunction could apply equally to protests which supported abortion as well as to protests which opposed abortion, or indeed, to protests supporting or opposing any other cause. It is true that this injunction applies only to McMonagle and his codefendants, but that is because it is only those persons who the Center has proved have created and are continuing to create a threat of violence and intimidation. The injunction thus meets the first factor listed in *Frisby* for a permissible "time place or manner" restriction, namely that it be content-neutral.

■ The second *Frisby* factor is that the injunction must be "narrowly tailored to serve a significant government interest." As this court has already noted, *see Northeast Women's Center, Inc. v. McMonagle,* 868 F.2d 1342, 1346 (3rd Cir.1989), the trial evidence established that the demonstrators could be heard in the Center's operating rooms, and that there were adverse medical consequences to patients as a result of the demonstrators' actions. The government "may properly assert important interests in safeguarding health" and "in maintaining medical standards" as regards the performing of abortions. *Roe v.*

*Wade,* 410 U.S. 113, 154, 93 S.Ct. 705, 727, 35 L.Ed.2d 147 (1973). Moreover, the Supreme Court has specifically held that the government has a "legitimate interest in seeing to it that an abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient." 410 U.S. at 150, 93 S.Ct. at 725. There can thus be no doubt that the injunction at issue here is designed to protect a significant governmental interest.

Having established that there is a significant governmental interest at stake, we must still determine whether the injunction is "narrowly tailored" to serve that interest. The first two sections of the injunction that McMonagle objects to, ¶¶ A(5) and A(6), both have specific time restrictions on their applicability. Both paragraphs apply only "[d]uring the hours 6:30 a.m. through 5:00 p.m. on Wednesdays, Fridays and Saturdays." 749 F.Supp. at 698 (the days and times when surgical procedures are performed). Indeed, ¶ A(5) further notes that it is designed to be limited to the times of "surgical procedures and recovery periods." As regards the location of protests, ¶ A(5) restricts the intrusion of sounds and images during the above-mentioned times that are "observable to or within earshot of patients inside the Center." Considering the opportunities that the injunction gives McMonagle to communicate his views and the past history of violence associated with him, we believe the restriction contained in paragraph A(5) is narrowly tailored.

Paragraph A(6) restricts the use of tables designed for the dissemination of anti-abortion information. Only one such table (to be kept at a specified location—the north side of Comly Road) is permitted within 500 feet of the property line of the Center. That one table may have one sign attached to it, displaying words of an "informational, non-inflammatory and non-violent nature." 749 F.Supp. at 699. It may be staffed by two people who may communicate with individuals who wish to talk to them, and such communications must be "non-threatening." In particular, persons approaching the table shall not be surrounded, harassed, or verbally abused.

We are satisfied that these restrictions are reasonable in light of the functions of the Center and the nature of the defendants' past conduct. To the extent that medical procedures are involved, concerns about patient safety and comfort are also applicable. In *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), the Supreme Court upheld enforcement of an anti-noise ordinance outside a school because noise interfered with the central purpose and use of the school. It reasoned that the nature and pattern of normal activities of an institution or organization dictate what is a reasonable time, place, and manner restriction. Given that the avowed purpose of the defendants is to prevent the Center from functioning, their conduct is "basically incompatible with the normal activity of [this] particular place," *Grayned*, 408 U.S. at 116, 92 S.Ct. at 2303.

Nonetheless, the district court's injunction is careful to permit expressive activity by the defendants within the restrictions decreed. The defendants may at *all* times engage in expressive activity near the Center. Up to six people may peacefully picket within 500 feet of the Center (on a designated side); they may sing, chant, and use sound amplification equipment at any time, as long as they cannot be heard inside the Center during the times designated in ¶ A(5); and *any* number of picketers or demonstrators may congregate at any time beyond the 500 foot limit. Moreover, the Center points out that the designated locations within the 500 foot limit at which picketing and table staffing are permitted are those areas of public property that are the *closest* to the Center's entrance. *See* Brief of Appellee at 24 (citing Plot Plan, 745 F.Supp. at 1098). In short, these terms of the injunction are narrowly tailored to serve its legitimate purposes. At the same time, they leave open alternative channels of expression for those who object to the Center's activities.

McMonagle's contention that the injunction is too vague is also meritless. He contends that one can never be sure what the terms "demonstrate" or "protest" mean. While language is often an imprecise medium, the terms of this injunction are sufficiently specific to be understood by the defendants and to put them on fair notice as to what they may and may not do. Indeed, the specific measures to which McMonagle objects—the 500 foot limit, the one table within that limit, etc.—provide the very specificity necessary for us to sustain the injunction against a charge of vagueness.

McMonagle also objects on the grounds of vagueness to the requirement that the sign at the informational table be "non-inflammatory" or "non-violent." In light of the history giving rise to this controversy and McMonagle's conduct, we would be hard pressed to fault the district court on its use of these terms, particularly since their meaning had to be evident to McMonagle in the context of his contempt proceeding. At the least, McMonagle had to know that a sign such as the one which was carried during his demonstration at Dr. Lakoff's home (which charged the doctor with having bought his home with the blood of unborn children) was inflammatory and/or violent in nature and would violate the terms of the injunction. We are satisfied that the district court acted reasonably in imposing the restriction with respect to the nature of the signs permitted at the Center, because of the pervasive history of violence (and a likelihood of future violence) by these specific defendants. *Compare Milk Wagon Drivers v. Meadow Moor Dairies, Inc.*, 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836 (1941) (upholding speech-related injunction following violence) *with NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) (cautioning against basing speech restrictions on trivial or insubstantial instances of violence).[11]

11. If McMonagle is ever charged with contempt for violating the injunction's restriction on the nature of the signs exhibited, he will then have the opportunity to claim that the injunction was too vague as applied to the particular sign and the particular language in question. The vagueness claim before us is a facial one, and we need not reach, and do not address, the merits of any "as-applied" challenge.

Paragraph A(7) of the injunction restricts picketing within 500 feet of the Center, but specifies that six picketers are permitted within that area as long as they "shall be clearly designated by clothing, signs or other plainly visible devices." 749 F.Supp. at 699. McMonagle characterizes this requirement as "a form of compulsory speech," akin to being forced to wear "yellow 'stars of David.'" Brief of Appellant at 30. In support of the claim that compulsory speech is repugnant to the First Amendment, he cites *West Virginia Bd. of Educ. v. Barnett,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) and *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). Both of these cases, however, involve compulsory speech affecting those who, unlike McMonagle, have never been found to have committed illegal acts, and who could not realistically avoid the act of compulsory speech.

*Barnett* involved schoolchildren who were required to pledge allegiance to the flag, and *Wooley* involved car owners who were required to display a state motto on their license plates. Here, by contrast, the defendants subject to the injunction were found to have engaged in violent and other illegal conduct. Moreover, the defendants within the 500 foot area will be those who have placed themselves within that perimeter in order to deliberately call attention to themselves. Thus, a signage requirement imposes little or no burden. The defendants are not required to close within 500 feet of the Center; and outside of the 500 foot radius there is no clothing or signage requirement at all. Moreover, the picketers who are required to "be clearly designated," are not thereby ordered to bear any particular label or communicate any particular viewpoint—indeed, the choice of designation is left up to them as long as they clearly identify themselves as picketers.

The district court has therefore not imposed any impermissible speech requirement on the defendants. In light of the defendants' history of intimidation and violence, it is reasonable that the district court require that those defendants who take advantage of the right to be within 500 feet of the Center be clearly identified as picketers so as to be recognized as such by Center employees or clients, as a measure to help enforce, and ensure that there are no violations of, the injunction. In short, the injunctive speech restrictions at the Center do not violate the Constitution, and the details of the injunction, which are within the discretion of the district court, do not constitute an abuse of the district court's discretion.

## B. Constitutionality of the Injunction in Respect to Picketing at the Residence of Staff.

Paragraph a(9) of the November 1, 1990 injunction reads as follows:

> At all times on all days, defendants are prohibited from congregating, picketing, patrolling, demonstrating or using bullhorns or other sound amplification equipment within twenty-five hundred (2500) feet of the residence of any of plaintiff's employees, staff, owners or agents, or blocking or attempting to block, barricade, or in any other manner obstruct the entrances, exits or driveways of the residences of any of the plaintiff's employees, staff, owners or agents and are prohibited from inhibiting or impeding or attempting to impede the free ingress or egress of persons to any street that provides the sole access to the street on which those residences are located.

749 F.Supp. at 699–700. The 2500 foot restriction was imposed by the district court in response to McMonagle's request for clarification of the August 27 injunction, which in ¶ A(9) had merely banned activities "at" the residences of Center employees or staff.

In *Frisby v. Schultz,* 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), the Supreme Court upheld an ordinance banning focused picketing that targeted a single residential house. McMonagle argues that the injunction here, which bans picketing in the entire 2500 foot area around certain houses, goes beyond the limits permitted

by the Court in *Frisby*.[12]

The injunction's restriction on home picketing was in response to the actions of the defendants in harassing Center employees at their homes, which harassment had been partly responsible for two employees resigning from their positions at the Center. At one demonstration, the defendants blocked the driveway of one of the Center's physicians, preventing him from traveling to the Center for a period of time. There was testimony that the picketing at the homes of Center employees had also frightened the children living in those homes. Under these circumstances, it is reasonable to restrict picketing and demonstrations around the residences of the Center's employees, staff, owners, and agents, as long as these restrictions meet the time, place, and manner tests required by the First Amendment. The Supreme Court in *Frisby* and in *Carey v. Brown*, 447 U.S. 455, 471, 100 S.Ct. 2286, 2295, 65 L.Ed.2d 263 (1980) has recognized the government's interest in "protecting the well-being, tranquility and privacy of the home." *Frisby* upheld an ordinance against targeted picketing of a home. It did note, however, that the demonstrators could picket in the same neighborhood as the designated house, as long as they did not stay in front of one residence for an extended period and thereby target it.

The district court took *Frisby* into consideration in fashioning its remedy. It noted that the defendants could march through, or picket in, residential neighborhoods as long as they did not encroach on the 2500 foot protected zone. The history of violence and intimidation by these defendants, and the fact that the injunction, unlike an ordinance, applies only to the defendants (and those affiliated or in privity with them), make the residential picketing restrictions more narrowly tailored to their legitimate purpose.

The extent of the protected zone, however—2500 feet—has been challenged by

McMonagle as exceeding permissible "place" restrictions. We note, first of all, that while our review of the details of a constitutionally sound injunction is for abuse of discretion alone, we must review as a matter of law—i.e. applying a plenary standard of review—the threshold question of whether the injunction fits within the parameters established by the Constitution. *See Evans v. Buchanan*, 555 F.2d at 378–79. We must therefore determine whether this term of the injunction is "narrowly tailored" to the legitimate purpose for which it was imposed.

■ Addressing ourselves first to the clause in paragraph A(9) which restricts the use of "bullhorns or other sound amplification equipment within twenty-five hundred (2500) feet of the residence of any of plaintiff's employees, staff, owners or agents," we note that McMonagle's counsel conceded at oral argument that this restriction was reasonable. That in itself would be sufficient reason to sustain this provision. In addition, however, we hold that the district court could reasonably have determined, given the nature and intrusiveness of sound amplification equipment, that these defendants may be required to keep sound equipment at least 2500 feet away from the protected residences in order to permit those protected by the injunction to preserve the privacy, security, and peaceful enjoyment of their homes.

■ On the other hand, we have difficulty in reconciling the restriction on picketing and patrolling, which requires that the defendants remain 2500 feet from the home of any protected resident, with the requirements of the First Amendment in the context of the present record.

In explaining its August 27, 1990 opinion, the district court had stated that the injunction it was imposing satisfied the third factor of the *Frisby* test—leaving open alternative channels of communication—by virtue of the fact that "defendants ...

---

**12.** McMonagle makes a separate, and erroneous, argument that the district court *sua sponte* and in violation of due process expanded the injunction to protect "owners" as well as "employees, staff, and agents," of the Center. In fact, this expansion, which added the term "owners" to the injunction, was in response to a motion by the Center, and therefore provided McMonagle with requisite notice in accord with his due process rights.

remain free to enter any neighborhood alone or in groups to march and peacefully spread their beliefs on the public ways." 745 F.Supp. 1082, 1092. The August 27 injunction merely restricted picketing, demonstrating, and using sound amplification "at" the residences of Center employees. 745 F.Supp. at 1096. Only later, in the November 1 Modified Permanent Injunction, did the district court specify a 2500 foot limitation. *See* 749 F.Supp. 695, 699.[13]

The district court, however, made no finding of fact and provided no discussion informing us of the basis for its selection of a 2500 foot protected zone. A divided Court in *Frisby* had upheld the ordinance banning targeted residential picketing only after interpreting the ordinance as narrowly limiting picketing in front of a *single* residence. *Frisby* leaves serious doubt, however, as to the constitutionality of a restriction on picketing within a half mile radius of a targeted home. Indeed, if hypothetically a Center employee lived in the middle of a neighborhood one mile in diameter, that entire neighborhood would be off limits to the defendants' picketing, under a 2500 foot radius requirement. It is therefore questionable whether a 2500 foot protected zone indeed leaves defendants "free to enter any neighborhood ... to march and peacefully spread their beliefs on the public ways." 745 F.Supp. at 1092.

Of course, we are dealing with a remedial injunction and not an ordinance of general application. Hence, *Frisby* may not strictly apply to the instant injunction. Nonetheless, the First Amendment issue involved here requires us to ensure that the remedy prescribed by the district court was narrowly tailored to its legitimate purpose. Under ordinary circumstances, the 2500 foot restriction appears to be larger than necessary to achieve the remedial purpose for which the injunction was imposed. This is so even given the defendants' history and actions.

■ We of course have the power to modify or even rewrite an injunctive order that exceeds permissible legal parameters. *See Evans v. Buchanan*, 555 F.2d at 381. Other circuits have modified similar injunctions which they found not to be clearly connected to the potential harm to be remedied. *See, e.g., Portland Feminist Women's Health Center v. Advocates for Life, Inc.*, 859 F.2d 681, 687 (9th Cir.1988) (modifying an injunction that banned noise-making at an abortion clinic, and limiting the injunction to prohibit noisemaking that was at "a volume that substantially interferes with the provision of medical services within the Center").

In the absence of findings, however, we can do no more than require the district court to reexamine the factual setting which gave rise to the 2500 foot restriction in connection with congregating, picketing, patrolling, or demonstrating. On the record before us, we see no basis for an injunction restricting residential picketing to more than 500 feet. We will therefore modify the injunction in the manner set forth in Part VI *infra* of this opinion in order to conform to this limitation. Nonetheless, it remains possible that facts of record before the district court may establish circumstances that could justify a residential picketing injunction of greater than 500 feet.[14] As set forth in Part VI *infra*, we will therefore remand this case to the district court for possible further modification of the injunction in this limited respect alone.[15] Restrictions on peaceful, non-fo-

**13.** Interestingly, though, it was McMonagle, not the Center, who requested modification of ¶ A(9) to clarify how close to residences the defendants could demonstrate. This fact, however, does not remove from our scope of review the district court's answer to McMonagle's question.

**14.** It may even be appropriate for the district court to retain the 2500 foot restriction if unusual or extraordinary circumstances are found. Barring such findings, however, the 2500 foot provision would appear on its face to constitute an excessive and overly broad restriction. In the absence of findings, we do not decide the constitutionality of the 2500 foot restriction.

**15.** The existing provisions of ¶ A(9) that ban obstructions of entrances and exits would of course remain in full force. These restrictions prohibit defendants from
> ... blocking or attempting to block, barricade, or in any other manner obstruct the entrances, exits or driveways of the residences

cused picketing are among the most constitutionally suspect of restrictions on conduct, even when applied to a group with a history of violent and illegal actions, and should be as sparingly imposed as possible.[16]

### IV.

We turn now to the district court's adjudication that McMonagle was in contempt of the August 27, 1990 injunction, and the court's order that McMonagle pay a portion of the Center's legal fees incurred in pursuing contempt proceedings. McMonagle announced his intention to disobey the injunction at a press conference on the day the injunction was issued. He stated specifically that "picketing at Kenneth Lakoff's and Malcolm Polis' homes will continue." Finding of Fact 1, App. 68–69. On August 30, 1990, McMonagle demonstrated with his group in front of Dr. Lakoff's home. After hearing evidence on whether this conduct violated the provision of the August 27 injunction barring "picketing [or] demonstrating ... at the residences of plaintiff's employees or staff," the district court found that McMonagle and the others had violated the order and had targeted Lakoff's home. It held McMonagle in contempt.

As discussed in Part III *supra*, the August 27 order was constitutional. Even if it were not, "the validity of the order may not be collaterally challenged in a contempt proceeding for violating the order."

*Roe v. Operation Rescue*, 919 F.2d 857, 871 (3rd Cir.1990); *Walker v. City of Birmingham*, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967). McMonagle raises no substantive factual challenge to the facts found by the district court surrounding his actions in contempt of the August 27 injunction. McMonagle was thus properly found in contempt of the August 27 order.

McMonagle further claims that the district court erred in denying his motion for a continuance so as to permit him to hire new counsel after his trial counsel, Ms. Connolly, withdrew from her representation of McMonagle effective October 1, 1990. The court proceeded with the contempt hearing on October 1, 1990, thus, according to McMonagle, making it difficult for him to defend himself in the absence of counsel. McMonagle's version of the procedural history, however, is a blatant distortion of the record. While the court did permit Connolly to withdraw effective October 1, and did deny McMonagle a continuance, the reason for Connolly's withdrawal was that McMonagle *requested* that she withdraw. Moreover, McMonagle advised the court that the reason for his request was that he wished to represent himself.[17]

Having secured the right to represent himself, McMonagle cannot object to the judge's ruling that he proceed with the case without obtaining additional counsel. Moreover, this was a civil, not criminal, contempt proceeding,[18] so that arguments

---

of any of the plaintiff's employees, staff, owners or agents [or] inhibiting or impeding or attempting to impede the free ingress or egress of persons to any street that provides the sole access to the street on which those residences are located.
749 F.Supp. at 699–700.

**16.** As noted above, the district court may retain its 2500 foot limit insofar as the use of "bullhorns or other sound amplification equipment," 749 F.Supp. at 699, is concerned.

**17.** The following colloquy appears in the record:
THE COURT: Mr. McMonagle, I understand that you have asked Ms. Connolly not to represent you any longer, is that correct?
MR. McMONAGLE: Yes, Your Honor, I would like to enter a pro-se representation.

App. at 138.

**18.** The district court specifically stated that this was a civil contempt proceeding. *See* App. at 145. The salient factors also indicate that the contempt was civil: The purpose of the hearing was remedial, and was for the benefit of the Center; the proceedings were initiated by the Center; and the sanctions were either remedial or coercive, rather than punitive. *See Roe v. Operation Rescue*, 920 F.2d 213, 216–17 (3rd Cir.1990). *See also Roe v. Operation Rescue*, 919 F.2d 857, 868 (3rd Cir.1990) ("When the relief provided is imprisonment, the contempt proceeding is civil 'if "the defendant stands committed unless and until he performs the affirmative act required by the court's order." ' " (quoting *Hicks v. Feiock* 485 U.S. 624, 632, 108 S.Ct. 1423, 1430, 99 L.Ed.2d 721 (1988))); *United*

predicated on the Sixth Amendment are inapposite. *See* 8B Moore's Federal Practice ¶ 42.02[2] ("Criminal contempt proceedings, *unlike civil*, require such protections as the sixth amendment right to counsel.") (emphasis added). We find no error in the district court's decision to proceed with the civil contempt hearing on October 1, 1990.

## V.

■■■ McMonagle's third claim is that it was improper for the district court to incarcerate him for failure to purge himself of contempt by paying $1,000 of the Center's attorneys' fees as ordered by the district court. The district court entered an order on October 22, 1990 requiring McMonagle to purge his contempt by, inter alia, paying $1,000 of the Center's reasonable counsel fees ($2,873) incurred in the prosecution of the motion for contempt. McMonagle does not deny that he refused to pay the counsel fees required of him by the district court.

As we have earlier stated, our review of McMonagle's argument that he could not be incarcerated is plenary. We review the district court's order requiring payments of $100 a month under an abuse of discretion standard. McMonagle moved the district court to stay its order of incarceration, which motion was denied. After refusing to pay the $1,000 or any installment thereof, and reporting for incarceration, McMonagle moved before this court for release from federal confinement, which motion was also denied. However, after 39 days of confinement, the district court *sua sponte* ordered McMonagle unconditionally released.

The Center's first response to McMonagle's appeal of his incarceration is that this issue is now moot. When the district court, *sua sponte*, determined that further incarceration of McMonagle was unlikely to have the desired coercive effect, it unconditionally released him from custody on December 10, 1990. The Center therefore contends that any decision by this court as to the propriety of the coercive incarceration would at this point be purely advisory, and would not provide any affirmative relief to McMonagle. *See McDonald's Corp. v. Victory Investments*, 727 F.2d 82, 85–86 (3rd Cir.1984).

Whether or not the issue of incarceration is moot is not a question which warrants extensive discussion here, in light of our determination that McMonagle's appeal is meritless.[19] Even assuming that the issue on which McMonagle desires review is not moot, we find that McMonagle's argument seeking to characterize his incarceration as "debtor's prison" is arguably frivolous. McMonagle claims that the $1,000 award was tantamount to the imposition of a civil debt, and that under 28 U.S.C. § 2007(a), "[a] person shall not be imprisoned for debt on a writ of execution or other process issued from a court of the United States in any State wherein imprisonment for debt has been abolished." He argues, in other words, that he was thrown into debtor's prison.

We note, however, that McMonagle never made any claim before the district court that he is unable to pay the $1,000 assessment, and does not so argue before us,

States v. North, 621 F.2d 1255 (3rd Cir.) (distinguishing between civil and criminal contempt), *cert. denied*, 449 U.S. 866, 101 S.Ct. 199, 66 L.Ed.2d 84 (1980). Here, McMonagle's incarceration was to continue only until he complied with the district court's order to make monthly payments of $100 in discharge of the $1000 attorneys' fee awarded to the Center.

**19.** Ordinarily, resolution of an issue that is no longer "live" will be held to violate the "case or controversy" requirement underlying federal court jurisdiction. The Supreme Court, however, has recognized an exception to the general rule that a case becomes moot when the parties lack a legally cognizable interest in the out-

come. The exception is for cases that are "capable of repetition yet evading review." *See, e.g., Murphy v. Hunt*, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982) (per curiam). In *Murphy*, the Court held that, in the absence of a class action, this exception was

limited to the situation where two elements combined: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.

*Murphy v. Hunt*, 455 U.S. at 482, 102 S.Ct. at 1183. Here, the possibility of repetition and the inherently short time limitation of a civil con-

except for a vague and unsubstantiated suggestion to that effect raised for the first time in his appellate brief. *See* Brief of Appellant at 48. His financial statements indicate a $36,000 annual income as Director of the Pro–Life Coalition of Southeastern Pennsylvania. Moreover, the district court permitted McMonagle to pay this assessment in monthly installments of $100.[20] McMonagle simply refused to make any portion of this payment.[21] Yet he concedes in his brief that "a court has the power to coerce obedience to its lawful orders," Brief of Appellant at 46.

■■■■ Indeed, district courts have broad discretion to fashion an appropriate civil contempt remedy. *In re Arthur Treacher's Franchise Litigation*, 689 F.2d 1150, 1158 (3rd Cir.1982). Civil contempt is designed to benefit the injured plaintiff by ensuring compliance with the court's orders and providing remedial damages to parties injured by the contemnor. *Latrobe Steel Co. v. United States Steel Workers*, 545 F.2d 1336, 1343–44 (3rd Cir.1976). As a general matter, moreover, a court may order a contemnor imprisoned until such time as the contemnor complies with the court's directives. *Delaware Valley Citizens' Council v. Commonwealth of Pennsylvania*, 678 F.2d 470, 478 (3rd Cir.), cert. denied, 459 U.S. 969, 103 S.Ct. 298, 74 L.Ed.2d 280 (1982); 8B Moore's Federal Practice ¶ 42.02[2] ("[T]he sanction[ ] of imprisonment ... [is] available in both civil

and criminal contempt proceedings."; "In a civil proceeding, the court can also impose a fine payable to an aggrieved party as compensation for damages sustained as a result of the contemnor's conduct."). In short, there is simply no basis for McMonagle's objection to the court's action.[22] McMonagle willfully refused to comply with a district court order despite his apparent ability to do so, which ability he did not put in issue before the district court. It was proper for the court to impose a $1,000 expense reimbursement fine on McMonagle as compensation to the Center for the legal fees it incurred as a result of McMonagle's contempt, and McMonagle was properly incarcerated as a coercive measure to induce him to purge his civil contempt.

As a final matter, McMonagle appeals from the district court's denial of his motion to stay incarceration and sanctions. That appeal, as we have noted earlier, is docketed at No. 90–1954. No argument respecting the district court's order of November 2, 1990, which denied a stay of its earlier orders regarding sanctions and incarceration, appears in McMonagle's brief. As we have earlier discussed, we are satisfied that McMonagle's incarceration was proper and that the sanctions imposed by the district court were well within its discretion.

---

tempt order would appear to lend continued viability to McMonagle's claim.

20. McMonagle did not appeal from the court's assessment that $100 per month was an appropriate payment toward the $1000 total. *Cf. United States v. Ofchinick*, 937 F.2d 892 (3rd Cir.1991) (district court's calculation of the monthly payments defendant must make toward his restitution obligation constitutes a new probationary condition which becomes ripe for appeal at the time it is imposed and must be challenged at that time or else it will be waived) (citing *United States v. Stine*, 646 F.2d 839 (3rd Cir.1981)).

21. As described in his own brief, McMonagle "articulated his refusal to pay on moral grounds." Brief of Appellant at 48. McMonagle cites no legal authority supporting any claim of right not to pay the amount ordered by the district court, except for the assertion that "there is considerable doubt from the record that he had the financial ability to pay in any event." *Id.* Such a claim, as noted in text

above, was not made before the district court and finds no support in the record.

22. McMonagle's analogy to debtor's prison is entirely inapposite in light of the fact that his refusal to pay was not based on an inability to pay, and that he raises before us only a belated —and, on the facts, highly implausible—suggestion of inability to pay. Moreover, McMonagle can hardly expect this court to countenance repeated violations of the orders of the district court justified merely by his personal beliefs. The fact that McMonagle may very firmly believe in the principles which induced him to violate the law and the orders of the district court, and may be prepared to face the legal consequences, has no bearing on the merits of his claim on appeal. An appeal that lacks any "colorable arguments" in its favor or is "totally without merit" is frivolous. *See In re Hall's Motor Transit Co.*, 889 F.2d 520, 523 (3rd Cir. 1989). It is difficult to see any "colorable arguments" whatsoever in support of McMonagle's contentions as to his coercive incarceration.

## VI.

For the reasons discussed above, we hold that the November 1, 1990 modified injunction is constitutional in all respects, except for that provision of ¶ A(9) which creates a 2500 foot zone around the residences of Center staff, employees, agents and owners within which McMonagle may not congregate, picket, patrol, or demonstrate, and as to which we have serious concerns. Because the record before us provides no evidence or findings which justify a 2500 foot restriction around the protected residences, we will modify ¶ A(9) of the injunction at this time to provide for an injunctive restriction of 500 feet.

While this 500 foot restriction is not specifically dictated by the record, the egregious circumstances which we have detailed in part III B *supra*—i.e. blocking the driveway of a Center physician, frightening children living in Center employees' homes, and carrying inflammatory signs targeting the homes of Center employees in violation of the district court's earlier injunction—require that picketing, patrolling, congregating and demonstrating be restricted to at least the same distance that the district court imposed with respect to actions at the Center itself, *see* Injunction ¶ A(6), until any further modification is ordered by the district court. We will affirm the remainder of paragraph A(9) as well as all other challenged provisions and terms of the injunction. So that there will be no misunderstanding of the manner in which we are modifying the district court's injunction, we direct that ¶ A(9) of the injunction now be modified to read as follows:

> At all times on all days, defendants are prohibited from congregating, picketing, patrolling, **or** demonstrating **within five hundred (500) feet of the residence of any of plaintiff's employees, staff, own-**

**ers or agents,** or using bullhorns or other sound amplification equipment within twenty-five hundred (2500) feet of the residence of any of plaintiff's employees, staff, owners or agents, or blocking or attempting to block, barricade, or in any other manner obstruct the entrances, exits or driveways of the residences of any of the plaintiff's employees, staff, owners or agents and are prohibited from inhibiting or impeding or attempting to impede the free ingress or egress of persons to any street that provides the sole access to the street on which those residences are located.[23]

We will also affirm the district court's adjudication of contempt arising from McMonagle's violation of the August 27, 1990 injunction. Lastly, we will affirm the coercive incarceration of McMonagle imposed by the district court to induce McMonagle to purge his contempt, as well as the district court's refusal to stay McMonagle's incarceration.

Costs are to be taxed against appellant McMonagle in Nos. 90–1845, 90–1954 and 90–1955. The mandate shall issue forthwith.

## APPENDIX

(Reproduced from 749 F.Supp. 695, 698)

### MODIFIED PERMANENT INJUNCTION

AND NOW, this 1st day of November, 1990, having this date issued an order modifying the August 27, 1990 permanent injunction, 745 F.Supp. 1082, it is hereby ORDERED and DECREED that:

A. The defendants, as named above, their officers, agents, servants, employees and attorneys, and all persons acting in concert or participating with, by, or through them [24] are hereby PERMANENT-

---

**23.** The text appearing in boldface is our addition to the text of the injunction as it was written by the district court.

**24.** For purposes of brevity, I shall hereafter refer to these individuals as "defendants." The use of this word, however, should not in any way be construed as limiting any portion of this permanent injunction to only those named defendants. It is this Court's clear intention that this permanent injunction shall apply to the defendants, as well as to their officers, agents, servants, employees, and attorneys; and to all persons acting in concert or participating with, by, or through them who receive actual notice of this order by personal service or otherwise.

LY and FINALLY ENJOINED and RESTRAINED from engaging in the following acts:

(1) **At all times on all days,** defendants are prohibited from entering the premises of the Northeast Women's Center, Inc. located at 2751/2811/2813 Comly Road in Philadelphia, Pennsylvania.

(2) **At all times on all days,** defendants are prohibited from entering the premises of L.P. Partnership or Comly Road Associates unless they are actually doing business with the Mellon Bank located on those premises.

(3) **At all times on all days,** defendants are prohibited from blocking or attempting to block, barricade, or in any other manner obstruct the entrances to the Northeast Women's Center, Inc. or the premises of L.P. Partnership and Comly Road Associates located at the addresses listed above.

(4) **At all times on all days,** defendants are prohibited from inhibiting or impeding or attempting to inhibit or impede the free and unmolested ingress and egress of persons to the Northeast Women's Center, Inc. or the premises of L.P. Partnership and Comly Road Associates located at the addresses listed above.

(5) **During the hours 6:30 a.m. through 5:00 p.m. on Wednesdays, Fridays, and Saturdays,** during surgical procedures and recovery periods, no singing, chanting, use of bullhorns, sound amplification equipment, or other sounds or images observable to or within earshot of patients inside the Center are permitted, with the exception of those set forth in paragraph A(6), below.

(6) **During the hours 6:30 a.m. through 5:00 p.m. on Wednesdays, Fridays, and Saturdays,** defendants are permitted to maintain no informational table closer than five hundred (500) feet from the plaintiff's property line as designated on the attached plot plan, except that one such table may be located on the sidewalk off the north side of the Comly Road alongside the Northeast Women's Center, at the location marked clearly with visual devices at the point designated on the attached plot plan as Area "A," with no more than one (1) signed attached to it displaying words of an information, non-inflammatory and non-violent nature. Any two defendants or any two individuals selected by defendants may peacefully maintain the table and may distribute literature or speak to individuals who wish to communicate with them immediately at the table. The individuals who staff this table may not shout out or use sound amplification equipment or physically approach plaintiff's patients or staff, but may engage in communications consisting of conversation of a non-threatening nature with any patient or staff person who choose to approach the table and speak to them. Should any individual decline such communication, otherwise known as "sidewalk counseling," that person shall have the absolute right to leave or walk away, and defendants, as well as all those covered by this restraining order, shall not accompany such person, encircle, surround, harass, threaten or physically or verbally abuse those individuals who choose not to communicate with them. This communication or "sidewalk counseling" shall not limit the right of the Police Department and/or the United States Marshal to maintain public order by reasonably necessary rules and regulations as they decide are necessary at the Center.

(7) **At all times including the times enumerated in paragraphs A(5) & (6),** the defendants, as named above, their officers, agents, servants, employees and attorneys, and all persons acting in concert or participating with, by or through them shall not congregate, demonstrate, counsel, picket, sing, chant, use sound amplification equipment, or engage in any other protest activity within five-hundred (500) feet of the outer perimeter of the property of either the L.P. Partnership or Comly Road Associates as designated on the attached plot plan, except that as many as six (6) persons may peacefully picket on the sidewalk off the north side of Comly Road alongside the Northeast Women's Center, in two areas marked on the attached plot plan as Area "B" on both sides of the driveway. While acting as a picketer, each such person shall be clearly designated by closing, signs, or other plainly visible devices. The driveway

shall be kept clear at all times for passage of vehicles and pedestrians and shall be clearly marked by plaintiff with plainly visible devices. Except as limited by this paragraph and paragraphs A(5) and A(6) above, the persons designated picketing may peacefully demonstrate, speak out, sing or chant on days other than Wednesday, Friday, or Saturday.

(8) **At all times on all days,** the defendants are prohibited from carrying out the following acts: (a) entering upon the Northeast Women's Center, L.P. Partnership's or Comly Road Associates' property, including the building, grounds, parking lots, or inner walkways unless they are actually doing business with the Mellon Bank located on those premises; (b) seizing or attempting to seize control of the plaintiff's offices thereon; (c) blocking or attempting to block persons from entering plaintiff's building, grounds or parking lot; (d) physically abusing or tortiously harassing persons entering, leaving, working at, or using the Center's facilities; (e) physically assaulting, battering, encircling or surrounding plaintiff's staff members, employees or patients; and (f) any other actions which have or reasonably might have the effect of intimidating patients, employees or staff members.

(9) **At all times on all days,** defendants are prohibited from congregating, picketing, patrolling, demonstrating or using bullhorns or other sound amplification equipment within twenty-five hundred (2500) feet of the residence of any of plaintiff's employees, staff, owners or agents, or blocking or attempting to block, barricade, or in any other manner obstruct the entrances, exits or driveways of the residences of any of the plaintiff's employees, staff, owners or agents and are prohibited from inhibiting or impeding or attempting to impede the free ingress or egress of persons to any street that provides the sole access to the street on which those residences are located.

(10) **At all times on all days,** defendants are prohibited from encouraging, inciting, or securing other persons to commit any of the prohibited acts listed in parts A(1), (2), (3), (4), (5), (6), (7), (8) or (9) above.

B. [Section B of the Modified Permanent Injunction is directed to the U.S. Marshal's Office and describes those functions for which the Marshals are responsible in implementing the terms of the injunction.]

\*   \*   \*   \*   \*   \*

C. Sanctions for Non–Compliance:

The defendants, their officers, agents, servants, employees and attorneys, and all persons acting in concert or participating with, by, or through them, including all persons restrained by this order, after notice and hearing, shall be subject to contempt proceeding and the imposition of such sanctions as the court deems proper under the circumstances if it is shown that this order has been violated. These sanctions may include if authorized by law: incarceration or detention, the posting of a bond, a penalty of five thousand dollars ($5,000.00) for each violation, payment of damages and attorneys' fees to plaintiff and such other sanctions against the contemnor as lawfully ordered by the court. The court may impose greater or lesser penalties in the event of aggravating, mitigating or extenuating circumstances.

D. Jurisdiction:

The court retains jurisdiction in this action.

This modified permanent injunction is intended to modify, incorporate and supersede the terms of the permanent and final injunction issued on August 27, 1990 and the injunction issued by the Honorable James McGirr Kelly by his order dated June 8, 1987.

This modified permanent injunction is *not* intended to modify in any way the *judgment,* entered by Judge Kelly by his order dated June 8, 1987 in accordance with the jury's answers to special interrogatories, as it appears in paragraphs 1 & 2 of that order.